[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *State v. Thompson,* Slip Opinion No. 2014-Ohio-4751.]

NOTICE

This slip opinion is subject to formal revision before it is published in an advance sheet of the Ohio Official Reports. Readers are requested to promptly notify the Reporter of Decisions, Supreme Court of Ohio, 65 South Front Street, Columbus, Ohio 43215, of any typographical or other formal errors in the opinion, in order that corrections may be made before the opinion is published.

SLIP OPINION NO. 2014-OHIO-4751

THE STATE OF OHIO, APPELLEE, *v.* THOMPSON, APPELLANT.

[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *State v. Thompson,* Slip Opinion No. 2014-Ohio-4751.]

*Criminal law—Aggravated murder—Killing law-enforcement officer to escape detection—Death penalty affirmed.*

(No. 2010-1373—Submitted April 8, 2014—Decided October 29, 2014.)

APPEAL from the Court of Common Pleas of Summit County,

No. CR 2008-07-2390.

_____

FRENCH, J.

{¶ 1} This is an appeal as of right by appellant, Ashford L. Thompson, who has been sentenced to death for the aggravated murder of Twinsburg Police Officer Joshua Miktarian. For the reasons below, we affirm Thompson's convictions and sentence.

**I. BACKGROUND**

{¶ 2} Following the murder of Officer Miktarian, the state charged Thompson with two counts of aggravated murder under R.C. 2903.01(B) and (E). Each count carried three death specifications: purposely killing a law-enforcement

officer, R.C. 2929.04(A)(6), killing to escape detection, R.C. 2929.04(A)(3), and killing while under detention, R.C. 2929.04(A)(4). The state also charged Thompson with two counts of escape, two counts of resisting arrest, three counts of tampering with evidence, and one count of carrying a concealed weapon. Every count of the indictment also carried at least one firearm specification.

{¶ 3} Thompson's jury trial commenced in 2010.

## A. The State's Case in Chief

### 1. Rav's Bar

{¶ 4} A little after midnight on July 13, 2008, Thompson picked up his girlfriend, Danielle Roberson, and they drove to Rav's Creekside Tap and Grill ("Rav's Bar"). The bartender, John Jira, recognized Thompson as a regular customer who typically ordered one beer and never caused trouble. That night, Jira served Thompson a single Budweiser draft at 12:30 or 1:00 a.m.

{¶ 5} Rav's Bar patron Steven Bartz testified that he saw a woman and a man, whom he later identified as Thompson, sitting at the bar that night. He said he had heard Thompson making angry comments. According to Bartz, Thompson was drinking a beer, was "slamming his glass on the bar," and "was pretty drunk." Bartz heard Thompson say to his companion, "There's demons in me" and "I will kill any one f* * *er that threatens me." Bartz also testified that Thompson said, "Nobody understands the s* * * I've done and am capable of doing. I can't even talk about it."

### 2. Traffic Stop

{¶ 6} Around 1:50 a.m. on July 13, Miktarian was en route to the Twinsburg police station. He was wearing a police uniform and driving a marked police cruiser. His police dog, Bagio, was with him.

{¶ 7} Miktarian began following Thompson's car near the intersection of State Route 91 and Glenwood Drive. Another driver, Natalie Spagnolo, testified that she saw a police cruiser turn on its lights and follow a car onto Glenwood

Drive that night. The car was playing music so loudly that she could hear it over her own loud music even though her windows were up.

{¶ 8} At about 1:55 a.m., Miktarian called dispatch to report a traffic stop at a residence on "Glenwood near 91." Thompson had pulled into his driveway on Glenwood, and Miktarian pulled into the driveway behind him. Miktarian provided the license plate number—"ITNL." Approximately two minutes later, he requested backup.

{¶ 9} The dispatcher, Christine Franco, ran the license-plate number on the Law Enforcement Data System at 1:55 a.m. Her search revealed that the owner of the vehicle had a license to carry a concealed firearm. Moments after Miktarian requested backup, Franco reported, "The only thing I know is he has a—he has a right to carry." Miktarian did not respond.

{¶ 10} Officer Patrick Quinn heard Miktarian's backup request over the radio and "figur[ed] something was possibly wrong." He responded, asking Miktarian "what he had." Miktarian did not answer, so Quinn "ran to [his] cruiser and then left the station with [his] lights and sirens activated."

{¶ 11} Moments later, the dispatcher received a phone call from Thompson's next-door neighbor, Mary Spisak. Around 2:00 a.m., Spisak woke to the sound of yelling outside her open window. She heard five popping sounds and called to report "shooting and arguing in the next-door neighbor's yard." The dispatcher relayed this information to Miktarian, but he still did not respond.

{¶ 12} Three other witnesses testified that they had heard popping sounds near 2454 Glenwood Drive around the same time. Two of the witnesses, Douglas Szymanski and Joseph Werling, were stopped in a car at the intersection of State Route 91 and Glenwood Drive when they saw the lights of a police cruiser 200 to 300 feet away and heard four gunshots. They drove onto Glenwood and saw a police cruiser parked in a driveway with its overhead lights on.

{¶ 13} Officers quickly arrived at the scene. Officer Quinn arrived first and saw Miktarian's cruiser with its lights on, but no other vehicles. Another officer arrived and saw Miktarian on the ground next to his cruiser. Miktarian had no vital signs when emergency medical services arrived.

{¶ 14} Thompson's driver's license and insurance card were in Miktarian's front shirt pocket.

### 3. Thompson's Arrest

{¶ 15} Twinsburg police enlisted the assistance of other local law enforcement to locate Thompson. Around 2:00 a.m., the Bedford Heights Police Department received notice that Thompson had a prior address in their jurisdiction, on Cambridge Drive. Three officers went to investigate.

{¶ 16} Around 2:20 a.m., Sergeant David Sandoval, Officer Anthony Vanek, and Officer Kimberly Callieham arrived at the Cambridge Drive address. They saw three people—two women and one man—standing in the driveway. Vanek also saw a vehicle with the license plate "ITNL" parked inside an open garage at the top of the driveway.

{¶ 17} Vanek began to question one of the women, Bridget Robinson, and she said that she was Thompson's sister. While Vanek was inquiring about Thompson's whereabouts, he heard a loud disturbance inside the house. He realized that the other woman, later identified as Danielle Roberson, had left the driveway.

{¶ 18} Vanek approached the house and opened the screen door; the main door was already open. He saw a man—later identified as Thompson—who had a pair of handcuffs hanging off his right wrist. Vanek confronted Thompson in the kitchen, and a struggle ensued. One officer seized a Kel-Tec 9 mm handgun from the stovetop, and another arrested Thompson and took him into custody.

#### 4. Physical Evidence

{¶ 19} At booking, Sergeant Greg Feketik photographed Thompson, his clothes and shoes, a small cut on his wrist, and the handcuffs he was wearing, which were marked with Miktarian's badge number. Later forensic testing confirmed the presence of blood with a DNA profile consistent with Miktarian's DNA profile on Thompson's left shoe, watch band, and shirt and on the barrel of the recovered gun.

{¶ 20} Dr. Darin Trelka, then a deputy coroner for Cuyahoga County, performed an autopsy on July 14, 2008. Trelka classified Miktarian's death as a homicide and determined that he died from four gunshot wounds to the head.

{¶ 21} Officers from the crime-scene unit photographed and documented the scene at Glenwood Drive and collected evidence. They recovered three spent bullets, and the medical examiner recovered a fourth bullet from Miktarian's skull during the autopsy.

{¶ 22} On the driveway, the crime-scene-unit officers found a pair of Miktarian's handcuffs and his Taser, which had been activated but not fired. Miktarian's handgun was still in a triple-retention holster on his duty belt.

{¶ 23} Officers also recovered a broken liquor bottle next to the sidewalk in front of Thompson's house. Two officers observed, but did not collect, a small, yellowish-grey, chewed-up food substance on the driveway. They later believed that the substance was garlic, because a search of Thompson's car uncovered a baggie containing garlic cloves. Detective Jason Kline explained that sometimes persons who have been drinking chew garlic when talking to police to cover the odor of alcohol on their breath.

{¶ 24} Inside Thompson's home, officers found a receipt documenting his purchase of a Kel-Tec 9 mm handgun. The serial number of the gun listed on the receipt matched the number on the gun found at the house on Cambridge Drive,

and subsequent ballistics testing confirmed that the spent bullets and shell casings recovered from the crime scene had been fired from that gun.

### B. The Defense's Case

{¶ 25} At trial, the defense presented one witness, Danielle Roberson. Roberson testified that at the time of the shooting, she had been dating Thompson for approximately two years.

{¶ 26} According to Roberson, on July 13, Thompson and his friend picked her up at her mother's house a little after midnight. After dropping off Thompson's friend, Thompson and Roberson went to Rav's Bar. Roberson testified that Thompson drank one-half of a beer. She did not recall Thompson's being angry or consuming any additional alcohol that night.

{¶ 27} The couple left the bar and headed toward Thompson's house. At the intersection of State Route 91 and Glenwood Drive, Roberson saw a police cruiser to the right. When the light turned green, Thompson turned left and drove the short distance to his driveway. Roberson said she saw the officer make a U-turn as Thompson's car turned the corner, but the cruiser's overhead lights were not on. According to Roberson, the officer pulled into the driveway behind Thompson's car and then turned his lights on.

{¶ 28} Roberson testified that she and Thompson started to get out of the car but then saw the officer approaching, so they stayed in the car. She said that the officer asked Thompson, "[W]hy are you running through my city with all that boom, boom, boom. I ought to rip all this s* * * out of your car." The officer then indicated that he had been following Thompson for two and one-half miles and asked why he had not stopped. The officer took Thompson's driver's license and insurance card and asked whether he had had anything to drink.

{¶ 29} It is not clear from Roberson's testimony when Thompson got out of the car, but he did at some point. According to Roberson, the officer "slapped" a handcuff on Thompson's wrist and Thompson somehow ended up on the

ground. Roberson testified that the officer threatened to let the dog out if Thompson tried anything and reached for his belt. Then he "slammed" Thompson onto the hood of the cruiser, over the side fender. As Roberson turned away, she saw the officer reach to his right side. The officer was right behind Thompson. Roberson saw Thompson turn around and shoot the officer. The officer fell. Roberson could no longer see what was happening, because the car was blocking her view, but she heard two more shots. Later in her testimony, she said that Thompson was standing over the officer when he fired those two shots.

{¶ 30} According to Roberson, Thompson told her to get back in the car, and they drove to his sister's home. Officers later arrived at Thompson's sister's house and tackled Thompson in the kitchen. During the struggle, Thompson tore off the refrigerator door. Ultimately, officers handcuffed Thompson.

### C. The State's Rebuttal

{¶ 31} The state recalled Detective Kline to the stand in rebuttal. Kline testified that he had listened to recordings of Thompson's jailhouse phone conversations with Roberson. The prosecution played the recording of a May 3, 2009 conversation between Thompson and Roberson. On the recording, Thompson explained that he had been "pissed" the night of Miktarian's death because Roberson had been "half dressed" when he and a friend arrived to pick her up. Thompson had just returned from a trip and was tired, and Roberson had been calling all day asking to see him.

### D. Verdict and Sentencing

{¶ 32} After a five-day trial, a jury convicted Thompson of both aggravated-murder counts and all associated specifications. Thompson was also convicted of escape, resisting arrest, tampering with evidence, and carrying a concealed weapon. The trial court dismissed one of the escape counts pursuant to Crim.R. 29.

**{¶ 33}** The trial court merged the two aggravated-murder convictions and two of the three death specifications for the mitigation hearing and sentencing. After the mitigation hearing, the jury unanimously recommended a sentence of death. The court agreed with the jury's recommendation and sentenced Thompson to death for one count of aggravated murder, R.C. 2903.01(E), with two death specifications—purposely killing a police officer, R.C. 2929.04(A)(6), and killing to escape detection, R.C. 2929.04(A)(3). The trial court also merged the three counts of tampering with evidence.

**{¶ 34}** The court imposed the following sentences for the remaining counts, with all sentences to be served concurrently with each other, except the terms for the firearm specifications: seven years for the merged firearm specifications, to be served consecutively to the other sentences, 12 months for escape, 18 months for felony resisting arrest, 90 days for misdemeanor resisting arrest, five years for tampering with evidence, and 12 months for carrying a concealed weapon.

**{¶ 35}** Thompson now appeals his conviction for aggravated murder and his death sentence, raising 18 propositions of law. We address some of Thompson's propositions of law out of order.

## II. ANALYSIS

### A. Final, Appealable Order

**{¶ 36}** In proposition of law No. I, Thompson challenges this court's jurisdiction to hear his appeal because, he claims, the trial court failed to issue a final, appealable order in compliance with Crim.R. 32(C). We conclude that the trial court complied with Crim.R. 32(C) and that this court has jurisdiction to hear Thompson's appeal.

### 1. Crim.R. 32(C)

**{¶ 37}** This court lacks jurisdiction over orders that are not final and appealable. *See* Ohio Constitution, Article IV, Section 3(B)(2); R.C. 2953.02.

{¶ 38} Crim.R. 32(C) prescribes the requirements for a final, appealable order in a criminal case. The rule in effect at the time of Thompson's conviction stated:

> A judgment of conviction shall set forth the plea, the verdict, or findings, upon which each conviction is based, and the sentence. Multiple judgments of conviction may be addressed in one judgment entry. If the defendant is found not guilty or for any other reason is entitled to be discharged, the court shall render judgment accordingly. The judge shall sign the judgment and the clerk shall enter it on the journal. A judgment is effective only when entered on the journal by the clerk.

Former Crim.R. 32(C) (2009), 122 Ohio St.3d c. Accordingly, we held that "a judgment of conviction is a final order subject to appeal under R.C. 2505.02 when the judgment entry sets forth (1) the fact of the conviction, (2) the sentence, (3) the judge's signature, and (4) the time stamp indicating the entry upon the journal by the clerk." *State v. Lester,* 130 Ohio St.3d 303, 2011-Ohio-5204, 958 N.E.2d 142, at ¶ 14.

{¶ 39} As a general matter, "[o]nly one document can constitute a final appealable order," meaning that a single entry must satisfy the requirements of Crim.R. 32(C). *State v. Baker*, 119 Ohio St.3d 197, 2008-Ohio-3330, 893 N.E.2d 163, at ¶ 17. There is, however, an exception for capital cases, in which R.C. 2929.03(F) requires the court or panel to file a sentencing opinion. *State v. Ketterer*, 126 Ohio St.3d 448, 2010-Ohio-3831, 935 N.E.2d 9, syllabus and ¶ 17-18. In those cases, "a final, appealable order consists of *both* the sentencing opinion filed pursuant to R.C. 2929.03(F) *and* the judgment of conviction filed pursuant to Crim.R. 32(C)." (Emphasis added.) *Id.* at syllabus.

## 2. The Trial Court's Orders

{¶ 40} On June 23, 2010, the trial court issued a sentencing opinion, as R.C. 2929.03(F) requires. In the opinion, the court sentenced Thompson to death on the capital count and also imposed sentences for the noncapital counts. That opinion was signed by the judge and journalized. The trial court also filed a separate entry on June 24, 2010, recording the jury's verdict finding Thompson guilty of 26 counts and specifications. That entry was likewise signed by the judge and journalized. Together, those two documents comply with the requirements of Crim.R. 32(C) and thus constitute a final, appealable order. *See Ketterer* at ¶ 17.

{¶ 41} Thompson does not dispute that these documents, if valid, satisfy the four requirements for a final, appealable order. Instead, he argues that we cannot even look to these documents to evaluate their compliance with Crim.R. 32(C) because (1) the entry filed on June 24 was replaced by a subsequent nunc pro tunc entry and (2) the sentencing opinion contained an error. Both arguments fail.

{¶ 42} First, Thompson argues that when a nunc pro tunc entry corrects an earlier entry, it entirely *replaces* the original entry. In this case, the trial court's June 24 entry mistakenly stated that Thompson's "sentencing hearing commenced on June 10, 2006." The sentencing hearing actually began on June 10, 2010. On July 1, 2010, the trial court entered a nunc pro tunc entry to change the erroneous date in the June 24 entry. Thompson says we can look only to the nunc pro tunc entry, and not to the June 24 entry, to evaluate compliance with Crim.R. 32(C).

{¶ 43} Thompson's argument misconstrues the nature of a nunc pro tunc entry. As we recently explained in *Lester*, 130 Ohio St.3d 303, 2011-Ohio-5204, 958 N.E.2d 142, the phrase " '[n]unc pro tunc' * * * is commonly defined as '[h]aving retroactive legal effect through a court's inherent power.' " *Id.* at ¶ 19, quoting *Black's Law Dictionary* 1174 (9th Ed.2009). Therefore, "a nunc pro tunc

entry by its very nature applies retrospectively to the judgment it corrects." *Id.* But a nunc pro tunc entry does not replace the original judgment entry; it relates back to the original entry. Thus, we need not disregard the trial court's June 24 entry.

{¶ 44} Second, Thompson claims that there is no final, appealable order here because the trial court's June 23 sentencing opinion contains an error. The opinion sentenced Thompson on Count 3 (third-degree felony escape), despite the fact that the court had previously dismissed that count. In the opinion, the court purported to merge Count 3 with Count 4 (fifth-degree felony escape) and then sentenced Thompson to five years on the two merged counts. This five-year sentence would have been appropriate for Count 3, but it exceeded the maximum 12-month punishment permitted for Count 4 alone. *See* R.C. 2929.14(A)(5) (authorizing a maximum sentence of 12 months' imprisonment for a fifth-degree felony); R.C. 2929.14(A)(3) (authorizing a maximum sentence of five years' imprisonment for a third-degree felony). Because Thompson should have been sentenced only on Count 4, not on Count 3, he could not have been sentenced to the five-year sentence the court imposed.

{¶ 45} Contrary to Thompson's claims, the trial court's mistaken reference to a five-year sentence in the June 23 sentencing opinion does not deprive this court of jurisdiction over this appeal. "[S]entencing errors are not jurisdictional." *Manns v. Gansheimer*, 117 Ohio St.3d 251, 2008-Ohio-851, 883 N.E.2d 431, ¶ 6 (holding that extraordinary writs are not available to remedy sentencing errors). Instead, sentencing errors can be remedied on appeal in the ordinary course of law. *State ex. rel Davis v. Cuyahoga Cty. Court of Common Pleas*, 127 Ohio St.3d 29, 2010-Ohio-4728, 936 N.E.2d 41, ¶ 2 (the erroneous inclusion of postrelease control in a sentencing entry can be remedied on appeal).

{¶ 46} To determine the appropriate remedy here, we need only look to the trial court's entries. Although the June 23 sentencing opinion mistakenly

referred to Count 3 and a five-year sentence for escape, the trial court's June 24 journal entry eliminated these erroneous references. The June 24 entry states that for the crime of escape, Thompson is sentenced to only *12 months*, and only on *Count 4*. The entry removes any reference to a five-year sentence for escape and contains no sentence whatsoever for Count 3. The record therefore clearly indicates that for the crime of escape, the trial court intended to impose a 12-month sentence on a single fifth-degree-felony count. Accordingly, this is the only escape sentence that applies to Thompson.

**{¶ 47}** In sum, we may properly consider both the trial court's June 24 entry and its sentencing opinion to evaluate compliance with Crim.R. 32(C). These two documents satisfy the requirements for a final, appealable order, and thus we do have jurisdiction over Thompson's appeal. We also address the error in the June 23 sentencing opinion by clarifying that Thompson is subject to only a 12-month sentence for escape, in accordance with the trial court's intent as expressed in its June 24 entry.

### B. Juror Issues

#### 1. *Batson* Challenge

**{¶ 48}** In proposition of law No. II, Thompson argues that the prosecution excused prospective juror No. 6 because of her race, in violation of *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). According to Thompson, the trial court erred by overruling his objection to the state's peremptory challenge. We disagree.

#### a. *Batson v. Kentucky*

**{¶ 49}** A defendant has "the right to be tried by a jury whose members are selected pursuant to nondiscriminatory criteria." *Id.* at 85-86. Accordingly, a constitutional violation occurs when the prosecution challenges "potential jurors solely on account of their race or on the assumption that black jurors as a group

will be unable impartially to consider the State's case against a black defendant." *Id.* at 89; *see also* Sixth and Fourteenth Amendments to the U.S. Constitution.

{¶ 50} In *Batson*, the United States Supreme Court established a three-step test for adjudicating race-based challenges. *See id.* at 96. "First, the opponent of the peremptory challenge must make a prima facie case of racial discrimination." *State v. Bryan*, 101 Ohio St.3d 272, 2004-Ohio-971, 804 N.E.2d 433, ¶ 106.

{¶ 51} If the opponent satisfies that burden, then "the burden shifts to the State to come forward with a neutral explanation for challenging black jurors." *Batson* at 97. "At this step of the inquiry, the issue is the facial validity of the prosecutor's explanation." *Hernandez v. New York*, 500 U.S. 352, 360, 111 S.Ct. 1859, 114 L.Ed.2d 395 (1991). Although it is not enough to simply deny a discriminatory motive or assert good faith, *Batson*, 476 U.S. at 98, 106 S.Ct. 1712, 90 L.Ed.2d 69, the "explanation need not rise to the level justifying exercise of a challenge for cause," *id.* at 97. *See also State v. White*, 85 Ohio St.3d 433, 437, 709 N.E.2d 140 (1999). Accordingly, " '[u]nless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral.' " *Purkett v. Elem*, 514 U.S. 765, 768, 115 S.Ct. 1769, 131 L.Ed.2d 834 (1995), quoting *Hernandez* at 360.

{¶ 52} Finally, "the trial court must decide based on all the circumstances, whether the opponent has proved purposeful racial discrimination." *Bryan* at ¶ 106; *see also Batson* at 98. The court must "assess the plausibility of" the prosecutor's reason for striking the juror "in light of all evidence with a bearing on it." *Miller-El v. Dretke*, 545 U.S. 231, 252, 125 S.Ct. 2317, 162 L.E.2d 196 (2005). Relevant factors may include "the prosecutor's demeanor; * * * how reasonable, or how improbable, the explanations are; and * * * whether the proffered rationale has some basis in accepted trial strategy." *Miller-El v. Cockrell*, 537 U.S. 322, 339, 123 S.Ct. 1029, 154 L.Ed.2d 931 (2003). "In addition, race-neutral reasons for peremptory challenges often invoke a juror's

demeanor * * *, making the trial court's firsthand observations of even greater importance." *Snyder v. Louisiana*, 552 U.S. 472, 477, 128 S.Ct. 1203, 170 L.Ed.2d 175 (2008).

{¶ 53} The trial court's finding at step three "is entitled to deference, since it turns largely 'on evaluation of credibility.' " *White* at 437, quoting *Batson* at 98, fn. 21. Accordingly, "[a] trial court's findings of no discriminatory intent will not be reversed on appeal unless clearly erroneous." *Bryan*, 101 Ohio St.3d 272, 2004-Ohio-971, 804 N.E.2d 433, at ¶ 106; *see also Cockrell* at 340. If, however, a trial court does err in applying *Batson*, the error is structural. *See United States v. McFerron*, 163 F.3d 952, 955-956 (6th Cir.1998) (cataloging federal appeals courts that have unanimously and "resoundingly" rejected arguments that *Batson* errors are subject to harmless-error review).

### b. Voir Dire and Dismissal of Prospective Juror No. 6

{¶ 54} During individual voir dire, the parties questioned prospective juror No. 6, an African-American, about her prior service as a juror in a criminal trial. Defense counsel inquired about the verdict in the prior case, and prospective juror No. 6 stated, "It was a hung jury." Defense counsel did not ask further questions on the matter.

{¶ 55} Later, the prosecutor asked what he called "follow-up question[s]" about the hung jury. He specifically inquired whether prospective juror No. 6 had been the holdout:

> MR. LOPRINZI: Were you—you were one side and some—the way you stated that, it sounded like maybe you were the—
> [PROSPECTIVE] JUROR SIX: There was one juror.
> MR. LOPRINZI: Who was holding out?
> [PROSPECTIVE] JUROR SIX: Yes.

MR. LOPRINZI: And you were with the others?

[PROSPECTIVE] JUROR SIX: Am I supposed to say?

MR. LOPRINZI: It's up to you.

THE COURT: It's up to you. The issue that he's really getting at is, you know, will that in any way affect—

[PROSPECTIVE] JUROR SIX: No.

THE COURT: Whether you were the one or you were the other 11—with the other 11.

MR. LOPRINZI: Well, we want to also know if you were in a jury here and you're one way for guilt or innocence either way, are you willing to stand up for your ground? And so that's why I was asking. It's hard to do, and that's why I was curious if you're able to do that.

Were you the one who—

[PROSPECTIVE] JUROR SIX: I think he had some extenuating circumstances.

MR. LOPRINZI: Very good. Thank you.

The prosecutor later used a peremptory challenge to excuse prospective juror No. 6. Thompson immediately made a *Batson* challenge.

{¶ 56} The state offered two race-neutral explanations for challenging the prospective juror. First, the prosecutor explained that he wanted to excuse prospective juror No. 6 because she had "implied that she was the sole holdout" when serving as a juror in a prior criminal trial. He reasoned that although seven of the 50 prospective jurors examined that day had previously served on a criminal-trial jury, prospective juror No. 6 was the only one who had been on a jury that had not reached a verdict, and she appeared to have been the sole holdout.

**{¶ 57}** The prosecutor and judge then discussed whether prospective juror No. 6 had in fact indicated that she had been a holdout. The prosecutor opined, "I think everybody knew that." Initially, the trial judge disagreed, emphasizing, "We don't know" because "[w]e didn't ask." The judge asked the prosecutor if he had another reason for challenging the prospective juror.

**{¶ 58}** At this point, the prosecutor offered an alternative explanation: prospective juror No. 6 worked as a receptionist for the sheriff's department and one of her relatives had worked at the prosecutor's office. The judge expressed skepticism that the state would object to seating a juror because of her connections with these two offices and declined to accept this reason.

**{¶ 59}** The prosecutor then returned to the holdout explanation, citing it as the "main reason" for the peremptory challenge. He elaborated on why "it was very clear to me that [prospective juror No. 6] was saying that she was the [holdout]." According to the prosecutor, when he asked the prospective juror whether she was the holdout, she "kind of smiled like she was the holdout," and he had the impression "that she just didn't want to say it." The prosecutor did not want to force the prospective juror to answer the question directly because he did not want a potential juror to resent him. But he was firmly convinced that she had been the holdout.

**{¶ 60}** After probing the prosecutor's reasoning, the judge stated, "You're saying that you have come to the conclusion, the firm conclusion, that she was a holdout juror." The judge acknowledged that the reason was race-neutral and explained that she had to decide whether the reason was "credible or pretextual." Ultimately, the judge rejected Thompson's *Batson* challenge, and prospective juror No. 6 was excused.

### c. The Trial Court Complied with *Batson*

**{¶ 61}** Thompson argues that the trial court's *Batson* analysis was improper and that the dismissal of prospective juror No. 6 violated his

16

constitutional rights. But our review of the record confirms that the trial court properly applied the *Batson* analysis to reject Thompson's challenge.

**{¶ 62}** Thompson's argument turns solely on whether the trial court properly conducted the third step of the *Batson* inquiry, which requires a court to assess the plausibility of the prosecutor's reason for striking a prospective juror "in light of all evidence with a bearing" on the issue. *Dretke*, 545 U.S. at 252, 125 S.Ct. 2317, 162 L.E.2d 196. At this stage of analysis, a trial court may "not simply accept a proffered race-neutral reason at face value," but instead "must examine the prosecutor's challenges in context to ensure that the reason [was] not merely pretextual." *State v. Frazier*, 115 Ohio St.3d 139, 2007-Ohio-5048, 873 N.E.2d 1263, ¶ 65. In short, the trial court must decide whether the prosecutor's reason is credible.

**{¶ 63}** Although a trial court must make a credibility determination, courts need not make detailed factual findings to comply with *Batson*. *Id.* at ¶ 98. Rather, " '[a]s long as a trial judge affords the parties a reasonable opportunity to make their respective records, he may express his *Batson* ruling on the credibility of a proffered race-neutral explanation in the form of a clear rejection or acceptance of a *Batson* challenge.' " *Id.,* quoting *Messiah v. Duncan*, 435 F.3d 186, 198 (2d Cir.2006).

**{¶ 64}** Here, the trial court fully explored the prosecutor's proffered explanations for the challenge in order to evaluate their credibility. Initially, the court expressed doubts about the holdout explanation. But after considerable probing and discussion about the basis for the prosecutor's belief that the prospective juror had been a holdout, the court denied Thompson's *Batson* challenge. This denial was "itself a finding at the third step" of *Batson*, reflecting the court's determination that the holdout explanation was credible. *Smulls v. Roper*, 535 F.3d 853, 863 (8th Cir.2008); *see also Frazier* at ¶ 98.

{¶ 65} Therefore, the trial court did not err by denying Thompson's *Batson* challenge, and we reject proposition of law No. II.

## 2. Inadequate Voir Dire

{¶ 66} Thompson next argues, in proposition of law No. III, that the trial court violated his constitutional rights by failing to conduct further inquiries about pretrial publicity after one prospective juror indicated that members of the jury pool had been discussing Thompson's withdrawn guilty plea. *See* Sixth and Fourteenth Amendments to the U.S. Constitution.

{¶ 67} On April 13, 2009, Thompson entered a guilty plea to the charges against him. Months later, the trial judge became concerned about Thompson's plea and scheduled a hearing to retake the plea. On December 18, 2009, Thompson requested a jury trial.

{¶ 68} Voir dire began on May 17, 2010, and lasted for five days. The trial judge and parties questioned prospective jurors about pretrial publicity during individual voir dire before conducting any group voir dire. At the time of questioning, the trial judge knew that a recent newspaper article had detailed the crime, as well as Thompson's previous entry—and then withdrawal—of a guilty plea. Therefore, the judge asked prospective jurors whether they were aware of the facts or the procedural history of the case.

{¶ 69} As Thompson concedes, the judge excused every prospective juror who knew about his withdrawn guilty plea after individual voir dire, with the exception of prospective juror No. 51. During individual voir dire, prospective juror No. 51 stated that she knew that Thompson had "actually pleaded guilty and then he recanted." The judge did not immediately excuse the prospective juror, because she assured the court that she would put the past guilty plea out of her mind and would not tell any other prospective jurors about it. It was not until later, during general voir dire, that the trial court ultimately excused prospective juror No. 51.

{¶ 70} Prospective juror No. 51's knowledge of the guilty plea is relevant because later in individual voir dire, prospective juror No. 100 revealed that he had heard someone else discussing the guilty plea "in the courtroom or the jury pool." Although prospective juror No. 100 was unable to identify the source of the information, he explained that he had "heard that originally there was a guilty plea but there was a technical problem or something and now it's a not guilty." The prospective juror indicated that this information made it difficult for him to be impartial, and the trial court excused him for cause.

{¶ 71} Thompson now objects that the trial judge, after learning that prospective jurors may have been discussing the withdrawn guilty plea, should have further questioned those prospective jurors who had already completed individual voir dire. In addition, Thompson suggests that the trial court should have questioned prospective juror No. 100 further to learn who was talking about Thompson's prior plea.

{¶ 72} "The manner in which voir dire is to be conducted lies within the sound discretion of the trial judge." *State v. Lorraine*, 66 Ohio St.3d 414, 418, 613 N.E.2d 212 (1993). The trial court has "great latitude in deciding what questions should be asked on *voir dire*." *Mu'Min v. Virginia*, 500 U.S. 415, 424, 111 S.Ct. 1899, 114 L.Ed.2d 493 (1991). In addition, we have not adopted a per se rule that requires a trial court to inquire into " 'every instance of alleged [juror] misconduct.' " *State v. Sanders*, 92 Ohio St.3d 245, 253, 750 N.E.2d 90 (2001), quoting *United States v. Hernandez*, 921 F.2d 1569, 1577 (11th Cir.1991). We will not find prejudicial error in the trial court's examination of the venire absent a clear abuse of discretion. *See State v. Jackson*, 107 Ohio St.3d 53, 2005-Ohio-5981, 836 N.E.2d 1173, ¶ 28.

{¶ 73} Here, an even more deferential standard applies because Thompson did not raise either objection before the trial court. Accordingly, we review Thompson's claim only for plain error. *See, e.g., State v. Brinkley*, 105 Ohio

St.3d 231, 2005-Ohio-1507, 824 N.E.2d 959, ¶ 64. To prevail, Thompson must show that an error occurred, that the error was plain, and that the error affected his substantial rights. *See* Crim.R. 52(B); *State v. Barnes*, 94 Ohio St.3d 21, 27, 759 N.E.2d 1240 (2002) (an error affects substantial rights only if it affected the outcome of the trial). We take "[n]otice of plain error * * * with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice." *State v. Long*, 53 Ohio St.2d 91, 372 N.E.2d 804 (1978), paragraph three of the syllabus.

{¶ 74} The trial judge did not conduct further individual voir dire of prospective juror Nos. 1 through 99 after speaking with prospective juror No. 100, but she did inquire further. On May 21, 2010, the judge conducted general voir dire of all the remaining prospective jurors. During this conversation, the court made several general inquiries, any of which would have prompted a prospective juror to indicate that he or she had learned more about the case from the jury pool.

{¶ 75} With respect to publicity, the judge stated: "I * * * had told you that you were not to read the paper, discuss this with your family, watch the news. Is there anyone who has had a family member say anything to them, accidentally flipping the channels saw something about this or read something in the paper without realizing it was this case?" One prospective juror responded, spoke privately to the judge, and was excused.

{¶ 76} A few minutes later, the judge posed several broader inquiries about whether any prospective juror had anything on his or her mind that would prevent him or her from being objective and impartial. First, she inquired, "Is there anyone who, as you sit here now, says, I don't think I can * * * set aside personal opinions. I can't set aside any knowledge that I might have. Because many of you had some knowledge, but not very much knowledge." Next, she asked whether anyone was thinking, "I would have to lay aside and erase from my mind, just like she told me in the original voir dire, anything I know, and I just

don't think I can do that? No one is raising their hand." Finally, she queried, "Anyone have any thoughts or ideas about what you've been through so far that you can't start fresh, open mind, when we start the trial on Monday? Anyone for whom that is a problem?" No one responded.

**{¶ 77}** These questions during group voir dire, coupled with the judge's earlier inquiries about publicity during individual voir dire, were sufficient to " 'reasonabl[y] assur[e] that prejudice would be discovered if present.' " *United States v. Chagra*, 669 F.2d 241, 250 (5th Cir.1982), quoting *United States v. Nell*, 526 F.2d 1223, 1229 (5th Cir.1976). Prospective jurors had repeated opportunities, even after the completion of individual voir dire, to come forward with any new knowledge they had gained about the case, including information from other prospective jurors and information about Thompson's guilty plea. In short, the trial court did not err by failing to ask prospective juror No. 100 additional questions, or by failing to conduct additional individual voir dire of prospective juror Nos. 1 through 99.

**{¶ 78}** Moreover, Thompson has failed to establish that the alleged error would have altered the outcome of his trial. Under these circumstances, the trial court need not have concerned itself with the possibility that a juror might theoretically "have difficulty in disbelieving or forgetting a defendant's opinion of his own guilt." *Chagra* at 251, fn. 11. For these reasons, we reject proposition of law No. III.

### 3. Rehabilitating a Prospective Juror Who Is Against the Death Penalty

**{¶ 79}** In proposition of law No. IV, Thompson argues that the trial court violated his constitutional rights by refusing "to follow the standard for exclusion of a capital juror expressing reticence about the death penalty" and by not allowing defense counsel to question prospective juror No. 2 about her views on the death penalty. *See* Sixth, Eighth, and Fourteenth Amendments to the U.S. Constitution; Ohio Constitution, Article I, Sections 9 and 10; R.C. 2945.25(C).

{¶ 80} During individual voir dire, prospective juror No. 2 informed the court that the days scheduled for trial would be "the worst time" possible for her to be away from work. Prospective juror No. 2 worked as a school secretary, and she indicated that she would "have three days to close up shop"—June 9, 10, and 11—after the students' last day of school. The judge explained to the prospective juror that she would be needed back on June 10 and asked whether anyone else could perform the prospective juror's job for her during that period. She replied, "Unfortunately not. I have an aid[e] that answers the phone and takes care of the sick children, but they don't have substitute secretaries." The judge credited this explanation, later commenting to counsel, "No schools have any extra people anymore because of budget cuts. I believe her when she says she's the only person."

{¶ 81} After a lengthy discussion of the prospective juror's views on the death penalty, the trial judge said she wanted to excuse prospective juror No. 2 for cause. The record indicates that the judge contemplated two independent bases for excusing the prospective juror. First, the prospective juror had a scheduling conflict. Second, the judge determined that the prospective juror had voiced an unequivocal opposition to the death penalty.

{¶ 82} Before the court excused prospective juror No. 2, defense counsel requested an opportunity to further question the prospective juror about her views on the death penalty. After verifying that defense counsel did not want to question the prospective juror about her schedule, the judge concluded that additional questioning was unnecessary. The judge explained that prospective juror No. 2's scheduling conflict was "sufficient" to excuse her, regardless of her views on the death penalty.

{¶ 83} Thompson does not allege any error in dismissing prospective juror No. 2 based on her scheduling conflict. The Revised Code and the Rules of Criminal Procedure both include catchall provisions allowing prospective jurors

to be challenged for cause if they are "unsuitable for any other cause to serve as a juror." R.C. 2945.25(O); Crim.R. 24(C)(14). A trial court's application of this provision is reversible only for an abuse of discretion. *See State v. Leonard*, 104 Ohio St.3d 54, 2004-Ohio-6235, 818 N.E.2d 229, ¶ 53. Here, the trial court reasonably exercised its discretion by excusing prospective juror No. 2 because of a scheduling conflict.

{¶ 84} Because the trial court had a valid, independent reason for excusing the prospective juror, which Thompson has not challenged, we reject proposition of law No. IV.

### 4. Failure to Life-Qualify Prospective Jurors

{¶ 85} In proposition of law No. V, Thompson asserts that his rights to a fair trial, equal protection, and due process were violated when the trial court "death qualified" his jury but did not "life-qualify" prospective jurors. *See* Fourteenth Amendment to the U.S. Constitution. Thompson does not allege that the trial court prevented defense counsel from questioning prospective jurors on this point; instead, he argues that the trial court's voir dire reflected the court's bias in favor of the prosecution.

{¶ 86} As an initial matter, the trial court *did* question Thompson's prospective jurors to avoid seating "death-prone" jurors. The court did not individually life-qualify every prospective juror. However, upon reconvening for general voir dire, the court said the following to the entire group of prospective jurors:

> If any of you are sitting on this jury and saying I'm going to make sure that if he's found guilty, he gets the death penalty, or I'm sitting on this jury to make sure that if he's found guilty, he does not get the death penalty, now is the time that you have to tell

us. And, again, no shame in it, no harm. Only you know your
hearts.

    But if you have any of those ideas in your head, you
need to tell us now.

No one responded.

{¶ 87} More important, this court has repeatedly rejected these same arguments in prior cases. There is no constitutional or statutory right to have the trial court life-qualify each prospective juror, even when the court sua sponte death-qualifies each prospective juror. *See State v. Hale*, 119 Ohio St.3d 118, 2008-Ohio-3426, 892 N.E.2d 864, ¶ 80; *State v. Davis*, 116 Ohio St.3d 404, 2008-Ohio-2, 880 N.E.2d 31, ¶ 76-77; *State v. Stojetz*, 84 Ohio St.3d 452, 705 N.E.2d 329 (1999), syllabus.

{¶ 88} For these reasons, we reject proposition of law No. V.

### C. Venue

{¶ 89} In proposition of law No. VI, Thompson claims that the trial court violated his rights to due process and to a fair trial by denying his motion for a change of venue. According to Thompson, "[t]he pretrial publicity surrounding [his] case so infected the jury that he was unable to obtain a fair trial in Summit County."

### 1. Pretrial Publicity and Venue

{¶ 90} Trial courts have a "duty to protect" criminal defendants from "inherently prejudicial publicity" that renders a jury's deliberations unfair. *Sheppard v. Maxwell*, 384 U.S. 333, 363, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966). Even so, "pretrial publicity—even pervasive, adverse publicity—does not inevitably lead to an unfair trial." *Nebraska Press Assn. v. Stuart*, 427 U.S. 539, 554, 96 S.Ct. 2791, 49 L.Ed.2d 683 (1976). "[T]he best test of whether prejudicial pretrial publicity has prevented obtaining a fair and impartial jury from

the locality" is "a careful and searching voir dire." *State v. Bayless*, 48 Ohio St.2d 73, 98, 357 N.E.2d 1035 (1976), *death penalty vacated on other grounds*, 438 U.S. 911, 98 S.Ct. 3135, 57 L.Ed.2d 1155.

{¶ 91} Decisions about whether to order a change of venue "rest[] largely in the discretion of the trial court." *State v. Fairbanks*, 32 Ohio St.2d 34, 37, 289 N.E.2d 352 (1972). We will not reverse a trial court's venue ruling "unless is it clearly shown that the trial court has abused its discretion." *Id.* An abuse of discretion is more than a mere error of law or judgment; instead, it implies that a trial court's decision was unreasonable, arbitrary, or unconscionable. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219, 450 N.E.2d 1140 (1983).

## 2. Motion for Change of Venue

{¶ 92} Thompson's counsel moved for a change of venue on February 3, 2010. The trial court held the motion in abeyance, explaining that it was "required to try to seat a jury, notwithstanding the fact that there's been a lot of publicity. If we cannot seat a jury, that's when we would begin the process of changing venue and not before."

{¶ 93} On May 17, 2010, the trial court called 150 prospective jurors and asked them to complete a questionnaire. Voir dire then proceeded in two stages. First, the judge and counsel questioned prospective jurors individually about their exposure to pretrial publicity and their attitudes about the death penalty. Throughout this process, the trial court dismissed prospective jurors who indicated significant knowledge of the case. In particular, the court excused the prospective jurors who knew that Thompson had pled guilty and had later withdrawn his plea.

{¶ 94} By May 20, 2010, the judge and parties had identified 50 qualified prospective jurors during individual voir dire. The judge announced, "[W]e're now going to stop individual voir dire, with the consent of both parties, correct?"

The parties indicated their consent. The judge then denied Thompson's motion for a change of venue.

### 3. No Actual Bias

{¶ 95} Ordinarily, to prove that a trial court erred by denying a change of venue, a defendant must show that at least one prospective juror was actually biased. *State v. Treesh*, 90 Ohio St.3d 460, 464, 739 N.E.2d 749 (2001). Here, Thompson does not identify any evidence of actual bias, and the record does not bear out such concerns.

{¶ 96} The trial court seated 12 jurors and four alternates. Thompson did not object to any of these jurors. Five of the jurors and two of the alternates knew *nothing* about the case. Three jurors had knowledge of the basic facts of Thompson's case: a police officer was shot and killed during a traffic stop. One knew only that the incident had occurred two years prior, and another knew that the incident occurred in Twinsburg and knew the victim's name. The last two jurors recalled nothing about the underlying facts of the case, but one knew that the trial had been delayed a few times, and the other had heard a news report that the case was going to trial soon. The remaining two alternates knew that the case involved a murder in Twinsburg, and one of them also knew that the victim was a police officer.

{¶ 97} Every juror and alternate who had *any* prior knowledge of the case unequivocally had stated in individual voir dire either that he or she could put that knowledge to the side, or that he or she had formed no opinions about the case or Thompson's guilt. The trial court had deemed the then prospective jurors qualified and had accordingly denied Thompson's motion for a change of venue. Later, during group voir dire, the court again verified that every prospective juror would set aside any preexisting knowledge, thoughts, or ideas about the case.

{¶ 98} Thompson argues that the trial court erred because courts may not rely on a prospective juror's subjective evaluation of his or her own ability to be

fair and impartial. In *Murphy v. Florida*, 421 U.S. 794, 800, 95 S.Ct. 2031, 44 L.Ed.2d 589 (1975), the United States Supreme Court explained that a "juror's assurances that he is equal to this task cannot be dispositive of the accused's rights," but left it "open to the defendant" to demonstrate a juror's actual bias. Even so, the judge "who sees and hears the juror," *Wainwright v. Witt*, 469 U.S. 412, 426, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985), has discretion "to accept [a juror's] assurances that he would be fair and impartial and would decide the case on the basis of the evidence," *State v. Jones*, 91 Ohio St.3d 335, 338, 744 N.E.2d 1163 (2001). Under the circumstances here, the trial court reasonably credited the jurors' assurances. We discern no evidence of actual bias here.

### 4. No Presumed Prejudice

{¶ 99} Nevertheless, Thompson urges us to presume prejudice.

{¶ 100} The United States Supreme Court has held that in certain rare cases, pretrial publicity is so damaging that courts must presume prejudice even without a showing of actual bias. *See, e.g., Sheppard*, 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600. But this presumption "attends only the extreme case." *Skilling v. United States*, 561 U.S. 358, 361, 130 S.Ct. 2896, 177 L.Ed.2d 619 (2010); *see also Treesh*, 90 Ohio St.3d at 464, 739 N.E.2d 749.

{¶ 101} To prevail on a claim of presumed prejudice, a defendant must make " 'a clear and manifest showing * * * that pretrial publicity was so pervasive and prejudicial that an attempt to seat a jury would be a vain act.' " *State v. Warner*, 55 Ohio St.3d 31, 46, 564 N.E.2d 18 (1990), quoting *State v. Herring*, 21 Ohio App.3d 18, 486 N.E.2d 119 (9th Dist.1984), syllabus. Thompson makes several arguments in support of presuming prejudice here, but none of them is persuasive.

{¶ 102} First, Thompson points to what he calls "the extreme amount of pre-trial publicity surrounding this case" and the fact that the jury pool was "replete with potential jurors who had been extensively prejudiced by media

accounts." According to Thompson, at least nine jurors had read, heard, discussed, or seen an account of Miktarian's death, and 20 prospective jurors were excused because they knew too much, knew about Thompson's guilty plea, or believed Thompson was guilty. But the fact that seven jurors and two alternates knew *something* about the case is hardly dispositive. As discussed above, jurors need not be totally ignorant about the facts of a case, and none of these individuals was actually biased. *See Irvin v. Dowd*, 366 U.S. 717, 722, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961). The fact that the trial court excused 20 prospective jurors because they knew too much about the case confirms only that the court was doing its job to ensure that Thompson's jury would not be unfair or biased.

{¶ 103} Second, Thompson argues that we should presume prejudice in light of discussions between prospective jurors at the courthouse. To this end, he points again to prospective juror No. 100's statement that he heard someone at the courthouse discussing Thompson's withdrawn guilty plea. He also notes that prospective juror No. 86, who was later seated as an alternate, told the judge she had overheard prospective jurors discussing the case in the hallways. Under the circumstances, Thompson says, the judge should have inquired further. And because she did not, he says we should presume prejudice now.

{¶ 104} These are not compelling reasons to presume prejudice. First, as discussed in proposition of law No. III, the trial court did not err by failing to conduct further individual questioning of the already qualified prospective jurors after hearing that some prospective jurors had been discussing the case. Second, the record does not indicate that any seated or alternate juror knew about Thompson's past guilty plea. Third, the conversation overheard by prospective juror No. 86 was of no import. She heard people speculating only about whether this was "that murder case in Twinsburg."

{¶ 105} Finally, Thompson analogizes the facts of his case to those in other cases in which the United States Supreme Court has presumed prejudice.

*See Sheppard*, 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600; *Rideau v. Louisiana*, 373 U.S. 723, 83 S.Ct. 1417, 10 L.Ed.2d 663 (1963); *Irvin,* 366 U.S. 717, 81 S.Ct. 1639, 6 L.Ed.2d 751. But the publicity in this case did not even begin to approach the level of pervasive communal influence present in those cases.

{¶ 106} In sum, Thompson fails to establish actual bias on his jury or to demonstrate that this is the rare case in which we must presume prejudice. As a result, we reject proposition of law No. VI.

### D. Improper Evidence

{¶ 107} In proposition of law No. VII, Thompson claims that the trial court violated Ohio Evid.R. 403 and 404, as well as his constitutional rights, when it permitted Steven Bartz to testify about statements Thompson allegedly made at Rav's Bar. *See* Sixth, Eighth, and Fourteenth Amendments to the U.S. Constitution; Ohio Constitution, Article 1, Sections 9 and 10.

{¶ 108} The trial court initially ruled on the admissibility of this evidence before the trial began. On May 24, 2010, the judge indicated her understanding that Bartz had overheard Thompson making five statements in Rav's Bar shortly before night of the murder. The defense objected that all these statements, although probative, were unfairly prejudicial. *See* Evid.R. 403. The court decided to exclude two statements that had a racial component, but found that the remaining three statements were not unfairly prejudicial: (1) "There's demons in me," (2) "I will kill if another f* * *er threatens me," and (3) "Nobody understands the s* * * I've done and I'm capable of. I can't even talk about it."

{¶ 109} The prosecutor quoted Thompson's three statements during his opening argument and introduced them through Bartz's testimony. Bartz identified Thompson in the courtroom and testified that he saw Thompson sitting with a female at Rav's Bar sometime after 11:30 p.m. on July 12, 2008. According to Bartz, Thompson was "pretty drunk" and was slamming his glass on the bar. Bartz recalled overhearing Thompson making some statements that made

Bartz "a little bit angry." Bartz then referred to his own prior written statement, given to police a day or two after the murder, to relate Thompson's three statements to the jury.

{¶ 110} Outside the presence of the jury, the trial court invited defense counsel to "elaborate" on his "objection to the three statements, just for the record." The defense argued that because the statements were general—and not specifically about killing a police officer—they were "much more prejudicial * * * than probative." The trial judge then explained that she had excluded "the statements that appeared to be slightly more racially charged" in order to "avoid[] any kind of sense of horror or appealing to an instinct to punish." The court found that the other three statements were "relevant, probative and not unduly prejudicial."

{¶ 111} "A trial court enjoys broad discretion in admitting evidence." *Long*, 53 Ohio St.2d at 98, 372 N.E.2d 804. We "will not reject an exercise of this discretion unless it clearly has been abused and the criminal defendant thereby has suffered material prejudice." *Id*.; *see also State v. Sage*, 31 Ohio St.3d 173, 510 N.E.2d 343 (1987), paragraph two of the syllabus.

{¶ 112} First, Thompson argues that the three statements repeated by Bartz were improperly admitted under Evid.R. 403. Evid.R. 403(A) states that a judge must exclude evidence, regardless of its relevance, if "its probative value is substantially outweighed by the danger of unfair prejudice." Unfairly prejudicial evidence usually appeals to the jury's emotions, rather than to intellect. *Oberlin v. Akron Gen. Med. Ctr.*, 91 Ohio St.3d 169, 172, 743 N.E.2d 890 (2001).

{¶ 113} Thompson says that the statements were not probative, because they did not go to his identity as a shooter and because the defense did not contest that he was the shooter. But the state had to prove more than just Thompson's identity as the shooter; it also had to prove that Thompson *purposely* killed Miktarian. *State v. Strodes*, 48 Ohio St.2d 113, 116, 357 N.E.2d 375 (1976).

30

Thompson's statements that he would kill if threatened and that no one understood what he was capable of were relevant to show the purposefulness of the killing. And his statement that there were demons inside him buttressed the statement that he would kill if threatened. Therefore, Thompson is wrong to say that the prosecution introduced these statements "to prove *only* that he was angry and dangerous." (Emphasis added.)

{¶ 114} Thompson also contends that this evidence was unfairly prejudicial because the statements "emotionally * * * painted a picture of an unstable, angry, generally dangerous person" and thereby encouraged the jury to decide the case on the basis of fear, not reason. But even assuming that Thompson's characterization of the statements is reasonable, he cannot show that the trial court's balancing was unreasonable, arbitrary, or unconscionable. *Blakemore*, 5 Ohio St.3d at 219, 450 N.E.2d 1140. As a result, we defer to the trial court's finding that the statements were admissible under Evid.R. 403.

{¶ 115} Second, Thompson objects to these statements as improper character evidence, admitted in violation of Evid.R. 404(A)(1). This rule provides: "Evidence of a person's character or a trait of character is not admissible for the purpose of proving action in conformity therewith on a particular occasion * * *." Because Thompson did not raise this objection at trial, we review his claim for plain error. *See State v. Perry*, 101 Ohio St.3d 118, 2004-Ohio-297, 802 N.E.2d 643, ¶ 14.

{¶ 116} Contrary to Thompson's assertions, the prosecution did not introduce this evidence in order to impermissibly portray him as an angry person, as someone with a general proclivity to violence, or even as someone who disliked law enforcement. Instead, this evidence of Thompson's statements *on the night of the crime* was probative of his intent when he killed Miktarian a few hours later. Therefore, this evidence did not violate Evid.R. 404.

{¶ 117} Moreover, even if the admission of these three statements had been improper, Thompson cannot show that they affected the outcome of his trial. Ample evidence supported Thompson's conviction for purposely murdering a law-enforcement officer and the associated death specifications.

{¶ 118} For these reasons, we reject proposition of law No. VII.

### E. Unqualified Experts

{¶ 119} Thompson argues, in proposition of law No. IX, that the trial court violated Evid.R. 702 and his constitutional rights by permitting unqualified expert witnesses to testify against him. *See* Fourteenth Amendment to the U.S. Constitution; Ohio Constitution, Article I, Sections 10 and 16. He also claims that the trial court breached its "duty to assess the relevancy and reliability of all scientific evidence introduced at trial."

{¶ 120} Pursuant to Evid.R. 702, a witness may testify as an expert when three criteria are satisfied. First, the witness's testimony must "either relate[] to matters beyond the knowledge or experience possessed by lay persons or dispel[] a misconception common among lay persons." Evid.R. 702(A). Second, the witness must be "qualified as an expert by specialized knowledge, skill, experience, training, or education regarding the subject matter of the testimony." Evid.R. 702(B). A witness does not need either complete knowledge of a field or special education or certification to qualify as an expert. *State v. Baston*, 85 Ohio St.3d 418, 423, 709 N.E.2d 128 (1999). Finally, the witness's testimony must be "based on reliable scientific, technical, or other specialized information." Evid.R. 702(C). In addition, all expert testimony remains subject to other evidentiary rules.

{¶ 121} Because Thompson failed to raise any of his current expert-testimony objections at trial, we review his claim for plain error only. *Baston* at 423.

**1. John Saraya**

{¶ 122} According to Thompson, plain error occurred when John Saraya testified because he was not qualified as an expert in blood-spatter analysis and his testimony lacked the requisite scientific basis.

{¶ 123} At trial, Saraya identified himself as a special agent for the Ohio Bureau of Criminal Identification and Investigation ("BCI") with 12 years of experience in the crime-scene unit. Saraya testified that as part of his training, he "attend[ed] a 40-hour blood spatter school." He summarized the history and science of blood-spatter analysis for the jury. Saraya then testified regarding his analysis of the blood spatter that had been found on Thompson's shoes and opined that the stains had come from a blood source no more than one foot away. The blood source had been in front of and almost parallel to the shoes when the shoes were spattered.

{¶ 124} Thompson raises multiple objections to this evidence. First, he says that the trial court erred by allowing Saraya to testify because the state never formally tendered him as an expert and the court never formally qualified him as an expert. We have repeatedly found that no plain error occurs when the state fails to formally tender an expert. *See*, *e.g.*, *State v. Hartman*, 93 Ohio St.3d 274, 285-288, 754 N.E.2d 1150 (2001); *Baston*, 85 Ohio St.3d at 422-423, 709 N.E.2d 128.

{¶ 125} Further, Thompson's objection that the trial court never engaged in a threshold analysis of Saraya's expert qualifications is unpersuasive. During Saraya's testimony, the trial court clearly stated that Saraya had "been qualified as an expert." Thus, Thompson knew that the court regarded Saraya as an expert but never objected to his qualifications or testimony. Under these circumstances, Thompson's first argument fails.

{¶ 126} Second, Thompson argues that Saraya was not qualified to testify as an expert. "Under Evid.R. 702, an expert may be qualified by knowledge,

skill, experience, training, or education to give an opinion which will assist the jury to understand the evidence and determine a fact at issue." *State v. Beuke*, 38 Ohio St.3d 29, 43, 526 N.E.2d 274 (1988). Here, Saraya testified that he had completed a 40-hour course on blood spatter and had been a member of BCI's crime-scene unit for 12 years. He also referred to his experience with blood-spatter analysis in other investigations.

{¶ 127} Thompson says Saraya's knowledge and experience were inadequate, compared to other cases in which blood-spatter experts testified. But a "witness need not be the best witness on the subject" to be qualified as an expert." *Scott v. Yates*, 71 Ohio St.3d 219, 221, 643 N.E.2d 105 (1994). Instead, the witness simply "must demonstrate some knowledge on the particular subject superior to that possessed by an *ordinary juror*." (Emphasis added.) *Id*. Here, Saraya's training and experience qualified him to provide expert testimony on blood-spatter analysis. *See, e.g., Hartman*, 93 Ohio St.3d at 285-288, 754 N.E.2d 1150.

{¶ 128} Third, Thompson argues that "the State failed to lay a proper foundation for the reliability of the science of blood spatter." He claims that "blood spatter evidence may be misleading and confuse the jury." But we have already "recognized that blood-spatter analysis is a proper subject for expert testimony." *Hale,* 119 Ohio St.3d 118, 2008-Ohio-3426, 892 N.E.2d 864, at ¶ 56.

{¶ 129} Fourth, Thompson objects that Saraya "did not give his opinion in terms of a reasonable degree of scientific certainty." We have "held that expert witnesses in criminal cases can testify in terms of possibility rather than in terms of a reasonable scientific certainty or probability." *State v. Lang*, 129 Ohio St.3d 512, 2011-Ohio-4215, 954 N.E.2d 596, ¶ 77, citing *State v. D'Ambrosio*, 67 Ohio St.3d 185, 191, 616 N.E.2d 909 (1993). In the criminal context, questions about certainty go not to admissibility but to sufficiency of the evidence; they are

matters of weight for the jury. *Id.* at ¶ 77. Thus, no error occurred when Saraya testified in terms of possibilities.

**{¶ 130}** Fifth, Thompson argues that Saraya's unreliable scientific evidence violated his rights to confront the witnesses against him and to present a complete defense. *See* Sixth and Fourteenth Amendments to the U.S. Constitution. Thompson reasons that his Sixth Amendment rights were violated because a criminal defendant cannot "confront a scientifically unreliable possibility." We rejected a similar argument in *Lang* at ¶ 83 and likewise reject Thompson's argument now. Thompson's attorney did cross-examine Saraya, and the defense had the opportunity to introduce contrary scientific evidence.

**{¶ 131}** Sixth, Thompson argues that Saraya's blood-spatter evidence was either not relevant and thus inadmissible under Evid.R. 401 and 402, or, even if relevant, was unfairly prejudicial under Evid.R. 403(A). Thompson offers no support for his claim that this testimony was not relevant. To the contrary, this evidence was relevant because it indicated that Thompson shot Miktarian in the head from a distance of no more than one foot, while Miktarian was lying on the ground. This evidence corroborated the coroner's statement that Miktarian was shot four times in the head, twice from a distance of two or three feet and twice when the gun was touching his skin. Accordingly, the trial court properly admitted Saraya's testimony under Evid.R. 401 and 402.

**{¶ 132}** The trial court also did not err in failing to exclude Saraya's testimony under Evid.R. 403. Evid.R. 403 provides that relevant evidence "is not admissible if its probative value is substantially outweighed by the danger of unfair prejudice." Here, Thompson asserts that Saraya's testimony, his courtroom reenactment, and the prosecutor's "exploitation of that testimony in closing argument" were prejudicial. But he does not explain how that testimony was *unfairly* prejudicial or why the danger of unfair prejudice outweighed the

probative value of the testimony. Accordingly, the trial court did not err by admitting this evidence under Evid.R. 403, let alone plainly err.

{¶ 133} Finally, even if any of Thompson's above objections had merit, we would still find no plain error. Saraya indicated that Miktarian's head (the blood source) was probably no more than one foot away from Thompson's shoes when the blood spatter was created. But the coroner also testified that Miktarian was shot at close range—twice from a distance of two or three feet, and twice with the gun touching his skin. And, consistent with Saraya's testimony, Sergeant Gina McFarren testified that Miktarian was probably lying on the ground when the final three shots were fired because "he had the one shot in the head and then the three shots in the side of the head." Likewise, Thompson's own witness, Danielle Roberson testified that the officer was on the ground when the last shots were fired. Thus, Thompson cannot show that Saraya's testimony necessarily affected the trial outcome.

### 2. Other BCI Analysts

{¶ 134} Thompson also argues that the trial court plainly erred by allowing four other BCI analysts to testify as experts. Specifically, he objects that the state failed to formally tender these witnesses as experts and that the trial court failed to make a threshold determination of their qualifications.

{¶ 135} As an initial matter, the record supports the trial court's decision to treat these witnesses as experts in their respective fields.

{¶ 136} • Dale Laux is a forensic scientist who testified about his formal education, his specialized training, and his 30 years of experience at BCI. He has testified as a serology expert in more than 300 Ohio cases. In this case, Laux testified primarily about his findings regarding the presence of blood on the items in evidence.

{¶ 137} • Martin Lewis is a forensic scientist who testified about his training, his prior employment, and his nine years of experience in BCI's trace-

evidence section. Lewis testified that he found gunshot residue in the sample taken from Thompson's hands.

{¶ 138} • Stacy Violi testified about her formal education, her BCI training in serology and DNA, and her ten years of experience with BCI's serology and DNA section. Violi has testified as a DNA expert on more than 90 occasions. In this case, she testified about the results of the DNA tests she performed on the items in evidence.

{¶ 139} • Andrew Chappell testified about his formal education, his training, and his eight years of experience in BCI's firearms section. Chappell has testified as a firearms expert in 56 Ohio cases, and he testified about firearms and gunshot residue in this case.

{¶ 140} We conclude that no plain error occurred when the trial court failed to qualify these four witnesses formally as experts at the outset of their testimony. *See State v. Powell*, 132 Ohio St.2d 233, 2012-Ohio-2577, 971 N.E.2d 865, ¶ 145; *Hartman*, 93 Ohio St.3d at 285-288, 754 N.E.2d 1150; *Baston*, 85 Ohio St.3d at 422-423, 709 N.E.2d 128.

{¶ 141} Thompson also argues that the trial court should have excluded this testimony because it does not pass the Evid.R. 403 balancing test. He generally asserts that a risk of unfair prejudice arose because the prosecutor and the trial court held these four witnesses out as experts; however, he makes no specific claims of prejudice. Further, he makes no effort to weigh the risk of prejudice against the probative value of this testimony. As a result, Thompson has not established any error in this regard.

{¶ 142} In sum, we discern no error in the admission of the challenged expert testimony. We also reject Thompson's argument that testimony from these five witnesses violated his due-process rights because it did not pass scientific muster under Evid.R. 702. Proposition of law No. IX fails.

### F. Statements about the Mitigation Phase

{¶ 143} In proposition of law No. VIII, Thompson argues that the trial court violated his due-process rights by telling jurors conclusively that there *would* be a second phase of the trial. He claims that the "judge conveyed that Thompson's guilt was a foregone conclusion" and "infringed upon his presumption of innocence." *See* Fourteenth Amendment to the U.S. Constitution; R.C. 2901.05(A). Thompson did not raise this objection at trial, so we review this proposition for plain error.

### 1. The Trial Judge's Statements

{¶ 144} The trial judge initially described Ohio's bifurcated process for capital trials to the jurors during voir dire. The judge explained that if Thompson were convicted of the charges against him, he "could be sentenced to death or to other options of life imprisonment." In light of the "possibility * * * that the death penalty could be, under certain circumstances, imposed," the judge advised that she and counsel would inquire about the prospective jurors' views on the death penalty.

{¶ 145} Before questioning began, the judge emphasized that these voir dire inquiries about capital punishment in no way "impl[ied] that the defendant is guilty of the crime that is charged" or "presuppose[d] that a finding of guilt should be made in this case." The judge explained, "*If* there is a conviction by the State proving that the defendant committed these crimes beyond a reasonable doubt, then there is a *possibility* that there will be a separate hearing, which we will call a sentencing hearing, where the jury will be called upon to make a determination regarding the sentencing." (Emphasis added.)

{¶ 146} With regard to scheduling, the trial judge informed the prospective jurors that the trial phase would begin the following week, and then said, "[*I*]*f* there's a sentencing phase, [it] will begin on June 10th." (Emphasis added.) Midway through the trial phase, someone apparently inquired about

whether the same schedule applied to alternate jurors.  In response, the trial judge stated:

> Alternates, at this point, I think the question was raised, you are on the same schedule as these jurors for sequestration. You will remain jurors until they go to deliberate for a verdict.
>
> If we get to the second phase, you remain as a juror.  And I'm glad that everyone is back, but we have a three-day weekend, and God forbid anything happens, but we will need you.  And there will be a break then between this phase and the next phase.  And you will remain part of the jury until we finish the second phase of the—get to that second phase.

Thompson did not object.

### 2.  Analysis

{¶ 147} "Ohio bifurcates capital trials into guilt and penalty phases."  R.C. 2929.03(D); R.C. 2929.04(B) and (C).  The jury initially determines a defendant's guilt.  If the jury convicts the defendant of aggravated murder and at least one death specification, then the trial proceeds to the second phase.  Otherwise, the second phase never occurs.

{¶ 148} In light of this bifurcated system, if a trial judge unequivocally tells a capital jury that there *will* be a second phase of the trial, the judge violates due process by communicating a belief in the defendant's guilt and undermining the presumption of innocence.  *State v. Williams*, 73 Ohio St.3d 153, 169, 652 N.E.2d 721 (1995); *see* R.C. 2901.05(A);  The judge does not violate due process by speaking "generally of there being a possibility that the jury would have to return for a second phase depending on the verdict."  (Emphasis deleted.)  *Id*.

**{¶ 149}** Thompson argues that the judge's language here was conclusive, not equivocal. We disagree. Considered in context, the judge's statements that "there will be a break then between this phase and the next phase" and "you will remain part of the jury until we finish the second phase of the—get to that second phase" did not imply Thompson's guilt to the jury. In the sentence immediately preceding these statements, the court stated: "*If* we get to the second phase, you remain as a juror." (Emphasis added.) By using the word "if," the judge clearly indicated that the trial may or may not reach the second phase; she "never spoke in definitive terms" regarding a second phase. *Williams* at 169. Moreover, as in *Williams*, the trial judge made the challenged statements about the second phase of trial in the context of explaining the schedule.

**{¶ 150}** Even early on, the judge also repeatedly emphasized that the second phase was only a *possibility*, not a certainty. She took pains to communicate that all discussions of capital punishment and the possibility of a second phase were not intended to convey anything about Thompson's guilt. And at the conclusion of the trial phase, the judge admonished the jurors, "If, during the course of the trial, I have said or done anything which you consider to be an indication of my view on these subjects, you are instructed to disregard it." We presume that the jury followed the judge's instruction. *See Pang v. Minch*, 53 Ohio St.3d 186, 195, 559 N.E.2d 1313 (1990).

**{¶ 151}** Accordingly, we conclude that the trial judge did not violate due process by implying Thompson's guilt, and we reject proposition of law No. VIII.

### G. Voluntary-Manslaughter Instruction

**{¶ 152}** In proposition of law No. XII, Thompson contends that the trial court erred by denying his request for a jury instruction on voluntary manslaughter. According to Thompson, the court's refusal to give this instruction violated his Eighth and Fourteenth Amendment rights. *See Beck v. Alabama*, 447 U.S. 625, 643-644, 100 S.Ct. 2382, 65 L.Ed.2d 392 (1980). We review a trial

judge's decision not to give a jury instruction for an abuse of discretion. *See State v. Wolons*, 44 Ohio St.3d 64, 68, 541 N.E.2d 443 (1989).

{¶ 153} R.C. 2903.03 defines the crime of voluntary manslaughter as follows:

(A) No person, while under the influence of sudden passion or in a sudden fit of rage, either of which is brought on by serious provocation occasioned by the victim that is reasonably sufficient to incite the person into using deadly force, shall knowingly cause the death of another * * *.

The test for voluntary manslaughter includes both an objective and a subjective component. First—the objective factor—a fact-finder must determine whether a serious provocation occurred and whether that provocation was "sufficient to arouse the passions of an ordinary person beyond the power of his or her control." *State v. Shane*, 63 Ohio St.3d 630, 635, 590 N.E.2d 272 (1992). Second—the subjective factor—the fact-finder must evaluate whether "this actor, in this particular case, actually was under the influence of sudden passion or in a sudden fit of rage." *Id.* at 634. A defendant being tried for murder must prove the elements of R.C. 2903.03(A) by a preponderance of the evidence. *State v. Rhodes*, 63 Ohio St.3d 613, 620, 590 N.E.2d 261 (1992).

{¶ 154} Thompson cites evidence that he says was sufficient to compel a voluntary-manslaughter instruction here. First, he quotes at length from his own unsworn statement. But Thompson did not give his statement until the mitigation phase. This information has no bearing on whether the trial court should have given an instruction at the *trial* phase of Thompson's trial. *See State v. Braden*, 98 Ohio St.3d 354, 2003-Ohio-1325, 785 N.E.2d 439, ¶ 71.

{¶ 155} Second, Thompson invokes the testimony of the sole defense witness, Roberson, who testified that Miktarian was being "rude" and "unprofessional." According to Roberson, he "kind of slammed [Thompson] down on the hood" of the police car and threatened to "let [his] dog out on [Thompson's] ass." At some point, Thompson ended up on the ground. Roberson said that she "feared for [Thompson's] life" and that Thompson later told her that he had shot Miktarian because Miktarian "was trying to hurt him."

{¶ 156} Finally, Thompson cites a variety of other evidence from the state's case-in-chief to support Roberson's account. Witnesses testified that Miktarian had removed his Taser from his duty belt (though he had not used it) and that his DNA (though not his blood) was found on the handle and trigger of Thompson's gun. Detective Kline testified that Miktarian's dog was acting very aggressively when police arrived at the scene, so aggressively, in fact, that the officers did not immediately let him out of the cruiser. And Luther Norman, who instructed Thompson on Ohio's concealed-carry law, testified that he teaches students that they each have to make a personal decision about when there is a serious enough possibility of death or serious bodily harm to justify discharging a weapon.

{¶ 157} The trial court acted within its discretion by declining to give a voluntary-manslaughter instruction on the basis of this evidence. Almost all the evidence cited by Thompson speaks to his fear that Miktarian would harm him. As we have held, "[f]ear alone is insufficient to demonstrate the kind of emotional state necessary to constitute sudden passion or fit of rage." *State v. Mack*, 82 Ohio St.3d 198, 201, 694 N.E.2d 1328 (1998); *see also State v. Harris*, 129 Ohio App.3d 527, 535, 718 N.E.2d 488 (10th Dist.1998) ("evidence * * * that the defendant feared for his own and other's personal safety, does not constitute sudden passion or a fit of rage as contemplated by the voluntary manslaughter statute").

**{¶ 158}** Roberson's testimony that Miktarian was being "rude" and "unprofessional" likewise is not sufficient to establish a sudden passion or a fit of rage. This court has held that "words alone will not constitute reasonably sufficient provocation to incite the use of deadly force in most situations." *Mack* at 201, citing *Shane*, 63 Ohio St.3d 630, 590 N.E.2d 272, at paragraph two of the syllabus. Here, the trial court reasonably concluded that Miktarian's reported "rudeness" would not arouse the passions of an ordinary person beyond the power of his control, even when coupled with evidence of fear. *See Shane* at 635.

**{¶ 159}** Moreover, nothing in the record indicates that Thompson actually was in a fit of passion or rage on the night in question. Roberson, Thompson's only witness, described the shooting and then simply testified that Thompson told her to get back in the car so the two could drive to Thompson's sister's house. Her testimony provides no insight into Thompson's actual state of mind or level of agitation at the time of the shooting. Under these circumstances, the court did not err by refusing to give a voluntary-manslaughter instruction.

**{¶ 160}** We therefore reject proposition of law No. XII.

### H. Prosecutorial Misconduct

**{¶ 161}** In proposition of law No. XI, Thompson claims that prosecutorial misconduct occurred throughout the proceedings, thereby depriving him of due process and a fair trial. *See* Sixth and Fourteenth Amendments to the U.S. Constitution; Ohio Constitution, Article I, Sections 10 and 16.

**{¶ 162}** To evaluate allegations of prosecutorial misconduct, we "must determine (1) whether the prosecutor's conduct was improper and (2) if so, whether it prejudicially affected [the defendant's] substantial rights." *State v. LaMar*, 95 Ohio St.3d 181, 2002-Ohio-2128, 767 N.E.2d 166, ¶ 121. Because prosecutorial misconduct implicates due-process concerns, "[t]he touchstone of the analysis 'is the fairness of the trial, not the culpability of the prosecutor.' " *State v. Jones*, 135 Ohio St.3d 10, 2012-Ohio-5677, 984 N.E.2d 948, ¶ 200,

quoting *Smith v. Phillips*, 455 U.S. 209, 219, 102 S.Ct. 940, 71 L.Ed.2d 78 (1982). We "will not deem a trial unfair if, in the context of the entire trial, it appears clear beyond a reasonable doubt that the jury would have found the defendant guilty even" absent the misconduct. *LaMar* at ¶ 121.

### 1. Voir Dire

{¶ 163} Thompson argues that the prosecutor engaged in misconduct by repeatedly giving prospective jurors an improper and misleading definition of the term "mitigating factors" during voir dire. Specifically, he objects to statements made by the prosecutor during the individual voir dire of prospective juror Nos. 7 and 16. Thompson did not object to either statement at trial, so we review his claim of prosecutorial misconduct for plain error only. *State v. Franklin*, 97 Ohio St.3d 1, 2002-Ohio-5304, 776 N.E.2d 26, ¶ 24. And because neither prospective juror was seated as a juror or an alternate, Thompson cannot establish plain error on this basis.

### 2. Improper Questions

{¶ 164} Thompson next claims misconduct occurred when the prosecutor asked witnesses leading and improper questions and elicited speculative testimony and hearsay.

### a. Leading Questions

{¶ 165} Thompson says the prosecutor asked leading questions during the testimony of John Jira, Christine Franco, and eight other witnesses. Thompson did not object to most of these questions at trial. Accordingly, we review these claims for plain error, unless otherwise noted.

{¶ 166} "A leading question is 'one that suggests to the witness the answer desired by the examiner.' " *State v. Drummond*, 111 Ohio St.3d 14, 2006-Ohio-5084, 854 N.E.2d 1038, ¶ 138, quoting 1 McCormick, *Evidence*, Section 6, at 19 (5th Ed.1999). Generally, this type of question "should not be used on the direct examination of a witness except as may be necessary to develop the witness

testimony." Evid.R. 611(C). Still, the trial court has discretion to allow leading questions on direct examination. *D'Ambrosio*, 67 Ohio St.3d at 190, 616 N.E.2d 909; *see* Staff Note to Evid.R. 611(C).

{¶ 167} First, Thompson claims that the prosecutor improperly led bartender John Jira while questioning him about Thompson's behavior on July 13. During his testimony, Jira confirmed that he was aware that a witness (Bartz) had overheard Thompson making statements in the bar that night. The prosecutor then asked, "You didn't hear him make those statements, did you?" Jira responded, "Not at all."

{¶ 168} Although the prosecutor's question was leading, the trial court had discretion to permit it. And even if the question had been improper, it was to Thompson's benefit. This question and answer showed that Jira was unable to corroborate Bartz's testimony about Thompson's behavior that night. Accordingly, we find no misconduct or plain error with regard to Jira's testimony.

{¶ 169} Second, Thompson objects to the prosecutor's redirect examination of police dispatcher Christine Franco. On cross-examination, Franco had testified that she did not receive a "distress code" from Miktarian on the night of his murder. She explained, "We don't usually use codes," and she agreed with defense counsel that an officer in trouble would normally say something like "I'm in trouble, or, I need help."

{¶ 170} On redirect, the prosecution asked leading questions in an attempt to establish that Miktarian may have been communicating distress when he requested another unit. After a sidebar, the trial court sustained an objection to the questioning, reasoning that the prosecutor was making "an argument" about Miktarian's meaning. The prosecutor attempted to rephrase the question, but the court sustained a second objection. At this point, the prosecutor inartfully asked Franco whether she had known Miktarian's reasons for requesting backup when she testified on cross-examination that Miktarian had *not* called in distress: "So

when you answered [defense counsel's] question, you didn't know that either?" Franco agreed that she had not known Miktarian's reasons.

{¶ 171} The trial court sustained objections to the first two questions cited by Thompson, so they cannot be the basis for a misconduct claim. *See Hale*, 119 Ohio St.3d 118, 2008-Ohio-3426, 892 N.E.2d 864, at ¶ 162. And Thompson did not object at trial to the state's final question and cannot establish plain error. Indeed, he does not even attempt to show that the outcome of his trial would have differed if Franco had definitively testified that Miktarian was not in distress when he called for backup. *See* Crim.R. 52(B).

{¶ 172} Finally, Thompson generally claims that the prosecutor committed misconduct by "us[ing] leading questions with many witnesses." He cites eight witnesses and corresponding transcript pages but offers no further argument in support of this claim. Many of Thompson's citations refer to instances in which the trial court sustained objections to a question, which cannot be the basis for a misconduct claim. In addition, some of the cited questions merely restated a witness's prior testimony, so they cannot be deemed prejudicial.

{¶ 173} What remains of Thompson's broad claim are leading questions about whether certain behavior is unusual in a bar, whether Miktarian's dashboard camera was recording, whether a Taser is deadly force, whether Thompson resisted arrest at his sister's home, the significance (or lack thereof) of finding no forensic evidence in a case, and a BCI analyst's past experiences swabbing guns for blood. Only one of these matters is potentially prejudicial—whether a Taser is deadly force. But Thompson did not argue self-defense, and he cannot rely on fear to prove manslaughter. Accordingly, even that testimony was not prejudicial, let alone outcome-determinative. We therefore reject all of Thompson's claims related to the use of leading questions.

### b.  Eliciting Hearsay

**{¶ 174}** Next, Thompson argues that the prosecution committed misconduct by eliciting hearsay testimony from Steven Bartz, thereby violating Thompson's confrontation rights.  Because Thompson did not object to this evidence at trial, he has waived all but plain error.  *See Jones*, 91 Ohio St.3d at 343, 744 N.E.2d 1163.

**{¶ 175}** Bartz relied on his written police statement when testifying, both on direct and on cross-examination.  The record indicates that Bartz did read some portions of his statement aloud to the jury.  But this admission of hearsay did not violate Thompson's confrontation rights, because the declarant (Bartz) testified at trial.  *See Powell*, 132 Ohio St.3d 233, 2012-Ohio-2577, 971 N.E.2d 865, at ¶ 64; *Leonard*, 104 Ohio St.3d 54, 2004-Ohio-6235, 818 N.E.2d 229, at ¶ 110.  Moreover, this evidentiary mistake did not rise to the level of plain error.

### c.  Eliciting Inflammatory Testimony

**{¶ 176}** Thompson also says that the prosecutor committed misconduct by posing inflammatory questions to Sergeant Sandoval and Danielle Roberson.  On redirect, the prosecutor asked Sandoval, "Sir, how many seconds does it take to reach for a gun and shoot and kill a police officer?"  And on cross-examination of Roberson, the prosecutor asked, "That officer had every reason in the world to be nervous, didn't he?"  In both instances, the trial court sustained defense objections and instructed the jury to "[d]isregard the question."

**{¶ 177}** Thompson "cannot predicate error on objections the trial court sustained."  *Hale*, 119 Ohio St.3d 118, 2008-Ohio-3426, 892 N.E.2d 864, at ¶ 162.  Accordingly, we reject these claims.

### 3.  Irrelevant and Prejudicial Evidence

**{¶ 178}** Thompson next alleges misconduct based on the introduction of two sets of photographs into evidence:  photos of a broken liquor bottle found at the scene, and photos of Miktarian and Bagio that show Miktarian wearing an

"Officer of the Year" pin. According to Thompson, the former were admitted only to encourage the jury to draw an improper inference and the latter were admitted only to evoke sympathy.

{¶ 179} The state introduced the first set of photos during the testimony of Gina McFarren, a retired sergeant in the Summit County Sheriff's Office. McFarren collected evidence at the Glenwood crime scene on July 13, 2008. At trial, she identified three photos of a broken liquor bottle that was found near the scene. The defense did not object.

{¶ 180} Thompson cannot show that plain error occurred when the prosecutor offered, and the trial court admitted, these photos. Evid.R. 402 generally establishes that all relevant evidence is admissible. These photos are relevant because they "helped explain the testimony of police officers who * * * processed the crime scene." *Jackson*, 107 Ohio St.3d 53, 2005-Ohio-5981, 836 N.E.2d 1173, at ¶ 85; *see* Evid.R. 401.

{¶ 181} Moreover, the probative value of this evidence was not "substantially outweighed by the danger of unfair prejudice." Evid.R. 403(A). Thompson says these photos allowed the jury to improperly infer that the bottle was his, even though no other evidence supported that inference. But the trial judge reasonably permitted the jury to draw its own conclusions about the bottle's presence at the scene. And defense counsel *did* make a case that the bottle was not Thompson's. On cross-examination, McFarren admitted that the bottle was next to the sidewalk, that she had no way of knowing who put it there or when, that Thompson's home is near a busy intersection, and that someone driving by could have thrown the bottle from a vehicle. Accordingly, Thompson cannot establish either that the prosecutor acted improperly by introducing these photos or that he was unfairly prejudiced by their admission.

{¶ 182} The state introduced photographs of Miktarian and Bagio during the direct examination of its first witness, Twinsburg Police Chief Christopher

Noga. The defense did not object, but now argues that these photos lacked probative value because they "had no basis other than to invoke sympathy in the jurors." This court has previously held that "[p]re-death photographs are relevant and admissible for purposes of identifying the victim[]." *LaMar*, 95 Ohio St.3d 181, 2002-Ohio-2128, 767 N.E.2d 166, at ¶ 57. Accordingly, plain error did not occur when these photos were offered and admitted into evidence.

### 4. Improper Character and Other-Acts Evidence

{¶ 183} Thompson claims that the state improperly introduced a recorded telephone conversation between Thompson and his girlfriend, Roberson, under the guise of rebutting Roberson's testimony.

{¶ 184} On cross-examination of Roberson, the prosecutor inquired about a phone conversation she had had with Thompson. Roberson agreed that Thompson had called her at some point after his arrest. The prosecutor then asked, "And he told you that he wasn't himself that day?" Roberson replied, "I don't recall that." The prosecutor asked whether Roberson recalled a series of statements that Thompson made during that conversation. Each time, Roberson responded, "I don't recall that." Ultimately, she explained, "I don't recall a lot of phone conversations because they were so long ago. It's been two years."

{¶ 185} After the defense rested, the prosecution recalled Detective Kline as a rebuttal witness. Kline testified that he had listened to recordings of jailhouse phone conversations between Thompson and Roberson, including their May 3, 2009 conversation about the events of July 13, 2008. The state played a recording of that conversation for the jury. On the recording, Thompson told Roberson that he had been "pissed off" because she "came out of the house half dressed and [he] had [his] friend in the car." He explained, "I had just got back from out of town. I was tired. And when I told you to get dressed and later when I got there you weren't dressed, and it just—it just pissed me off." Thompson then noted, "But it

wasn't just all of that. * * * It was just everything, man. I had enough, man. I had enough with life, man, you know."

{¶ 186} Thompson claims that this was improper character and other-acts evidence under Evid.R. 404, because it was offered to persuade the jury that "Thompson was a bad person and acted in conformity therewith on the night in question." Evid.R. 404(A) generally prohibits the admission of "[e]vidence of a person's character or a trait of character * * * for the purpose of proving action in conformity therewith on a particular occasion." Likewise, "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith." Evid.R. 404(B). Thompson did not object to this evidence at trial, so his claim is reviewable only for plain error. *See State v. McKnight*, 107 Ohio St.3d 101, 2005-Ohio-6046, 837 N.E.2d 315, ¶ 270.

{¶ 187} The May 2009 recording did not violate Evid.R. 404, because it was not offered to prove Thompson's general character or action in conformity with that character. Instead, this evidence was relevant to establishing Thompson's mindset on the night he killed Miktarian. During her testimony, Roberson provided the foundation for the defense's theory that Thompson acted in response to Miktarian's conduct that night. Indeed, the defense argued at closing that Thompson acted out of "self-preservation" and "instinct." The state offered this recording to undermine that defense theory and to corroborate Bartz's testimony that Thompson was agitated hours before he encountered Miktarian.

{¶ 188} This recording was relevant to establish Thompson's mental state and thus his purpose in killing Miktarian. It was not improper character or other-acts evidence.

### 5. Trial-Phase Closing Argument

{¶ 189} Thompson next contends that the prosecutor committed misconduct during trial-phase closing arguments by making several "wholly

improper" statements that "violated Thompson's rights to due process, a fair trial, and his right to remain silent."

{¶ 190} First, Thompson says that the state improperly shifted the burden of proof to the defense. During the state's rebuttal closing, Prosecutor Brian LoPrinzi recounted his efforts to anticipate what Thompson's defense would be:

So I started going through all the defenses and I thought, okay, what types of defenses do we have?

We have insanity. They're not pleading insanity. * * * It is not an issue.

What other defenses are there? It wasn't me. You got the wrong guy.

Well, we know that's not on the table because they've gotten up and told you it was him, not to mention we have DNA. We have all kinds of evidence contrary to that.

State failed to prove its burden?

Ladies and Gentlemen, that's not the defense. The Defense basically has told you that he did this. They've told you that. That's not a defense.

Mr. O'Brien [defense counsel] has now discussed a little bit with you about using that gun in self-defense. * * * It is not an issue. You cannot consider self-defense.

* * *

So what is their defense?

You just heard from Mr. O'Brien their defense. It was subtle, but it was pervasive. The officer was rude.

So after two weeks of being here, two and a half weeks of being here, putting on mounds and mounds and mounds of

evidence, scientific evidence, eyewitnesses, audio witnesses, overwhelming evidence, we are here now talking about the bedside manner of Officer Miktarian. It's absurd. It is absurd.

Thompson did not object.

{¶ 191} It is "improper for the prosecutor to suggest that the defendant had the burden of proof or any obligation to produce evidence to prove his innocence." *United States v. Clark*, 982 F.2d 965, 968-969 (6th Cir.1993). Thompson claims that the prosecutor's statements here may have somehow implied that Thompson needed to provide a defense.

{¶ 192} Even assuming the prosecutor's statements were improper, they did not prejudicially affect Thompson's substantial rights. In its first closing statement, the prosecution clearly stated that the state bore the burden of proving guilt beyond a reasonable doubt, then argued that Thompson had "no legal or justifiable excuse for his crimes." More important, the trial judge instructed the jury that "[t]he defendant is presumed innocent until his guilt is established beyond a reasonable doubt. The defendant must be acquitted unless the State produces evidence which convinces you beyond a reasonable doubt of every essential element of each of the offenses charged in the indictment." We presume that the jury followed the court's instructions. *State v. Loza*, 71 Ohio St.3d 61, 79, 641 N.E.2d 1082 (1994). Therefore, the challenged statements did not amount to plain error.

{¶ 193} Second, Thompson says that the prosecution improperly denigrated the defense in three ways: (1) by describing the defense theory as "absurd," (2) by suggesting that the defense wanted to take Bartz's testimony away "because it's very offensive," and (3) by asking, "How much more do you think the Defense is willing to deceive you to find out—find the defendant not guilty." The first and second statements do not merit concern. Although the term

52

"absurd" is extreme, there is nothing improper about arguing that the defense theory is not well-founded. Nor was it improper to suggest that the defense would have preferred if certain evidence had not been introduced at trial.

{¶ 194} The prosecution's third statement, however, is more troubling. We have held that the state may not "unfairly suggest[] that the defense's case was untruthful and not honestly presented." *LaMar*, 95 Ohio St.3d 181, 2002-Ohio-2128, 767 N.E.2d 166, at ¶ 167. Here, the prosecutor implied that because Thompson lied to Miktarian about whether he had consumed alcohol on July 13, 2008, the jury should question whether the defense was lying to secure an acquittal. This was improper. Even so, Thompson did not object to the statement at trial, and he cannot show that but for this comment the outcome of his trial would have been different. Therefore, he cannot establish error on this basis.

{¶ 195} Third, Thompson objects to the prosecutor's commentary about Count 8 of the indictment, tampering with evidence. The prosecutor commented that if Miktarian's handcuffs had not been engraved by Miktarian, Thompson would probably claim they belonged to him. This comment was improper. It does not amount to plain error, however, because "it appears clear beyond a reasonable doubt that the jury would have found the defendant guilty [of this count] even without the improper comment[]." *LaMar* at ¶ 121.

{¶ 196} Fourth, Thompson claims that the prosecutor improperly expressed his opinion about Danielle Roberson's credibility. The prosecutor observed that Roberson had offered conflicting accounts of what happened after Thompson fled the scene. He then commented: "Danielle told you quite a few things. And you have to feel bad for whatever motivations this defendant may have put upon her to come in here and not tell you everything that happened." The trial court overruled a defense objection. A few moments later, the prosecutor commented, "Abraham Lincoln once said that even the greatest of liars tells 100 truths to one lie, because otherwise, they'd have no credibility at all.

And Danielle, she twisted some things, but * * * at times, even in those lies, the truth comes out." Finally, he argued that Roberson was willing to testify for Thompson "and change her account of what happened."

{¶ 197} As a general matter, "[i]t is improper for an attorney to express his or her personal belief or opinion as to the credibility of a witness." *State v. Williams*, 79 Ohio St.3d 1, 12, 679 N.E.2d 646 (1997). Here, the prosecutor did not merely suggest that gaps in Roberson's own testimony—or inconsistencies with her prior statements—indicated that she was not telling the whole story. He also suggested that Thompson had pressured Roberson to lie. No evidence on the record supported this claim, and it was improper for the prosecutor to make this comment.

{¶ 198} But Thompson cannot establish that this error prejudiced his substantial rights. The prosecutor improperly commented on Roberson's account of what happened at Thompson's sister's house, *after* Thompson had already killed Miktarian and fled the crime scene. The improper comment was not plain error, because "it appears clear beyond a reasonable doubt that the jury would have found the defendant guilty even without the improper comments." *LaMar*, 95 Ohio St.3d 181, 2002-Ohio-2128, 767 N.E.2d 166, at ¶ 121.

{¶ 199} Fifth, Thompson says that the prosecutor improperly vouched for two state witnesses. Namely, the prosecutor stated that "there's no evidence to suggest that Mr. Bartz had any motive to lie" and that BCI analyst John Saraya's testimony was "based on the physical evidence," which "doesn't have a stake in the outcome of this case."

{¶ 200} "Vouching occurs when the prosecutor implies knowledge of facts outside the record or places his or her personal credibility in issue." *Davis*, 116 Ohio St.3d 404, 2008-Ohio-2, 880 N.E.2d 31, at ¶ 232. Here, the prosecutor did no such thing. The prosecutor's first comment merely argued that no evidence on the record undermined Bartz's truthfulness. The second argued that

Saraya's testimony was trustworthy because it turned on his analysis of physical evidence, which speaks for itself. Accordingly, these comments were not improper.

**{¶ 201}** Finally, Thompson says that the prosecutor argued evidence of character or bad acts to encourage the jury to draw negative inferences about him. The prosecutor described the recorded phone conversation between Thompson and Roberson as "a phone call of the true Ashford Thompson." He then argued:

> [Y]ou can hear the anger in his voice that is still there from July the year before. The night he killed a police officer, he's saying, let's talk about how you were dressed.
>
> That was the real Ashford Thompson, the man at 2454 Glenwood on July 13th of 2008, not the man put in a suit here in front of you for the past two weeks who makes his smiles and rolls his eyes.
>
> The anger of Ashford Thompson is apparent in that May 2009 phone call. The blame that he gives others is apparent in that 2009 phone call. That is the real Ashford Thompson. That is the Ashford Thompson that Officer Joshua Miktarian encountered that morning. That is the man that the piece of the puzzle comes from that Steven Bartz heard say there is demons in me. I will kill any MF'r that threatens me. Nobody understands the s* * * I've been through and I'm capable of. That is the man we ask you to judge here today. He is the same man you heard obsessing and controlling Danielle in that phone call yesterday. * * *
>
> That is the man that in cold blood gunned down and killed Officer Joshua Miktarian, who was doing his duty to serve us.

{¶ 202} We have "previously held that the prosecution is entitled to a certain degree of latitude in summation." *Treesh*, 90 Ohio St.3d at 466, 739 N.E.2d 749. Here, the prosecutor claimed that the phone recording revealed "the real Ashford Thompson." He argued that Thompson's voice and words reflected anger and said that that anger was consistent with Bartz's description of Thompson's behavior at Rav's Bar the night of the murder. He also argued that Thompson essentially blamed Roberson for his mood that night. These are fair arguments based on the evidence at trial. By contrast, the prosecutor's comment that Thompson is "obsessing and controlling" improperly encouraged the jury to draw negative inferences about Thompson's character. Even so, this comment did not amount to plain error.

{¶ 203} Ultimately, we must review the prosecutor's "closing argument in its entirety to determine whether prejudicial error occurred." *Treesh* at 468. Here, although the prosecutor made some improper statements during closing arguments, these statements "did not permeate the state's argument" so as to deny Thompson a fair trial. *Id.* And even if these comments had been prejudicial, we could cure that error during our independent sentence evaluation. *See, e.g., Bryan*, 101 Ohio St.3d 272, 2004-Ohio-971, 804 N.E.2d 433, at ¶ 227. Accordingly, we reject Thompson's claims that plain error occurred during trial-phase closing arguments.

### 6. Mitigation-Phase Closing Argument

{¶ 204} Finally, Thompson argues that the prosecutor committed misconduct by appealing to the jury's sympathy and emotions during mitigation-phase closing arguments.

{¶ 205} During closing argument, the prosecutor discussed the aggravating circumstance of killing a law-enforcement officer. He emphasized that "this case is not about Officer Miktarian" but about "what he represented." He discussed how the mitigation hearing had honored Thompson "by letting his

whole family, friends, people that he worked for, come and say wonderful things about him." Then he told the jury, "now it's time to stop honoring the Defendant and start honoring the law." The prosecutor asked the jury to "do an honest weighing of the aggravating circumstances against the mitigating factors." He advised, "[Y]ou now have to decide the weight. Are you going to honor Mr. Thompson, or are you going to honor the law, that badge? Which do you give more weight?"

{¶ 206} The prosecutor's statements were not improper. The prosecutor correctly explained the process of weighing aggravating circumstances and mitigating factors to the jury. As to the aggravating circumstance at issue here—killing a law-enforcement officer—the prosecutor advised the jury to consider the victim's "badge" and his role as a representative of "the law." By contrast, the prosecutor referred to all of Thompson's mitigation evidence during the mitigation phase as evidence "honor[ing] him." Thus, when the prosecutor asked the jury to decide whether to honor "Mr. Thompson" or "the law," he essentially asked for nothing more than the weighing required by R.C. 2929.04.

{¶ 207} Further, even if the prosecutor's comment had somehow misled the jury about the nature of the weighing process, Thompson cannot establish prejudice. The judge properly instructed the jury, and we presume that the jury followed those instructions. *Loza*, 71 Ohio St.3d at 79, 641 N.E.2d 1082. Accordingly, Thompson's claim of misconduct during the mitigation-phase closing argument fails.

### 7. Cumulative Misconduct

{¶ 208} Thompson urges this court to aggregate all of the alleged misconduct and determine whether, in its entirety, it " 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.' " *Darden v. Wainwright*, 477 U.S. 168, 181, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986), quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643, 94 S.Ct. 1868, 40 L.Ed.2d

431 (1974). The above analysis indicates that the prosecutor engaged in some questionable conduct at trial. Regardless, none of that conduct, viewed individually or in the aggregate, deprived Thompson of a fair trial. *LaMar*, 95 Ohio St.3d 181, 2002-Ohio-2128, 767 N.E.2d 166, at ¶ 182.

{¶ 209} We reject proposition of law No. XI.

## I. Trial Court Errors

{¶ 210} Thompson asserts in proposition of law No. X that a variety of errors and omissions by the trial court violated his rights to due process and a fair trial. Sixth and Fourteenth Amendments to the U.S. Constitution. As Thompson notes, "the judge * * * has the ultimate responsibility for the conduct of a fair and lawful trial." *Lakeside v. Oregon*, 435 U.S. 333, 341-342, 98 S.Ct. 1091, 55 L.Ed.2d 319 (1978).

### 1. Voir Dire

{¶ 211} Thompson argues that the trial court erred by failing to correct counsel's definitions of mitigating circumstances at voir dire.

{¶ 212} Thompson's claim turns on statements made during individual voir dire. During voir dire of prospective juror No. 7, the prosecution described mitigation as "any good that the defendant wants you to hear and consider," and the defense described it as "good things * * * about Mr. Thompson's life." The state also described mitigation to prospective juror No. 16 as "factors that the Defense can put on or may put on—and that could be anything that tends to lessen the severity of the case or his culpability."

{¶ 213} Thompson cannot prevail on this claim, because neither prospective juror who heard these alleged misstatements was seated as a juror or even as an alternate.

### 2. *Batson*

{¶ 214} Thompson also contends that the trial court improperly excluded an African-American prospective juror in violation of *Batson*, 476 U.S. 79, 106

S.Ct. 1712, 90 L.Ed.2d 69.  We reject this claim for the reasons explained in our analysis of Thompson's second proposition of law.

### 3.  Improper Questioning, Testimony, and Evidence

{¶ 215} Next, Thompson says that the trial court violated his rights to due process and a fair trial by permitting the prosecution to commit the misconduct alleged in proposition of law No. XI.  Thompson says that the court should have stopped the state from leading witnesses, eliciting hearsay testimony, introducing improper and prejudicial evidence, and making improper and inflammatory statements during closing statements.  But as discussed above, the alleged misconduct did not violate Thompson's rights.  Therefore, the trial court's failure to stop this conduct likewise did not deprive Thompson of due process or a fair trial.

### 4.  Inspection of Records

{¶ 216} Finally, Thompson argues that the trial court should have ensured that he was present to review Miktarian's personnel records.

{¶ 217} On February 25, 2010, the court granted a defense motion to review Miktarian's personnel file.  On March 24, 2010, the prosecutor expressed concern about confidential information in the file and explained, "I don't [want] the parts that are not relevant to be discussed or reviewed or released to the defendant."  The judge ordered the prosecutor to produce the file and said that she would set up a time to go through each page of it with the prosecutor and defense counsel and would give defense counsel a copy of whatever she thought was appropriate.  Defense counsel suggested that the parties do a preliminary review before meeting with the judge.  The judge agreed, noting, "And Mr. Thompson will not be present for discovery."  Moments later, the judge confirmed that Thompson understood what was going on and did not have questions.  The defense raised no objections.

{¶ 218} Defense counsel later received access to the entire unredacted file. During the sentencing hearing, the prosecutor noted, "For the record, we gave Mr. Thompson the officer's records, completely unredacted. His attorneys had an opportunity to look at them." The record does not indicate whether Thompson himself reviewed the materials.

{¶ 219} Thompson now claims that the trial court erred by not ensuring his personal presence for the review of Miktarian's file. A trial court must ensure a defendant's presence at critical stages of prosecution, *see State v. Williams*, 6 Ohio St.3d 281, 286-287, 452 N.E.2d 1323 (1983), but Thompson cites no authority extending that obligation to the discovery context. In fact, in the few cases in which defendants have claimed a right of access to all discovery materials, "most courts have held that '[t]rial counsel's decision whether to provide [the defendant] with discovery materials constitutes a matter of trial strategy and judgment that ultimately lies within counsel's discretion.' " *People v. Krueger*, 296 P.3d 294, 300 (Colo.Ct.App.2012) (cataloging cases to analyze whether defendant's lack of access to discovery materials created a conflict between him and trial counsel), quoting *People v. Davison*, 686 N.E.2d 1231, 1236 (Ill.App.Ct.1997). "[A]llowing a defendant unfettered access to discovery materials could create friction between the defendant and his attorney" and would make him "more likely to question his attorney's strategic decisions, with little or no justification, thereby undermining the attorney-client relationship." *Krueger* at 300. Thompson cannot establish error in this regard.

{¶ 220} In addition, the alleged error was not outcome-determinative: Thompson's counsel had access to Miktarian's file, and they were able to assess whether it included information helpful to Thompson's defense.

{¶ 221} For the above reasons, we reject proposition of law No. X.

## J. Ineffective Assistance of Counsel

{¶ 222} In proposition of law Nos. XIII and XIV, Thompson argues that counsel provided constitutionally ineffective assistance. *See* Sixth and Fourteenth Amendments to the U.S. Constitution; Ohio Constitution, Article 1, Section 10.

{¶ 223} To establish ineffective assistance, a defendant must both (1) show that counsel's performance "fell below an objective standard of reasonableness," as determined by "prevailing professional norms," *Strickland v. Washington*, 466 U.S. 668, 688, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984) and (2) demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different," *id.* at 694. When performing a *Strickland* analysis, we "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689.

### 1. Pretrial and Trial Claims

#### a. Voir Dire

{¶ 224} Thompson argues that counsel provided deficient performance during voir dire in several regards.

{¶ 225} When evaluating claims of ineffective assistance at voir dire, we have "recognized that counsel is in the best position to determine whether any potential juror should be questioned and to what extent." *State v. Murphy*, 91 Ohio St.3d 516, 539, 747 N.E.2d 765 (2001); *see State v. Mundt*, 115 Ohio St.3d 22, 2007-Ohio-4836, 873 N.E.2d 828, ¶ 65 (in some cases, counsel may decide the best tactic is to "ask[] few or no questions of a prospective juror"). In fact, " '[f]ew decisions at trial are as subjective or prone to individual attorney strategy as juror *voir dire*, where decisions are often made on the basis of intangible factors.' " *Mundt* at ¶ 64, quoting *Miller v. Francis*, 269 F.3d 609, 620 (6th Cir.2001). We "consistently decline[] to 'second-guess trial strategy decisions' or impose 'hindsight views about how current counsel might have voir dired the jury

differently.' " *Mundt* at ¶ 63, quoting *State v. Mason*, 82 Ohio St.3d 144, 157, 694 N.E.2d 932 (1998).

**{¶ 226}** First, Thompson critiques trial counsel's performance with regard to the trial court's dismissal of six prospective jurors for cause, based on their reticence about imposing the death penalty. During voir dire, prospective juror Nos. 11 and 66 said that they did not believe that they could impose a death sentence. Prospective juror Nos. 48 and 69 said there was little chance they could sign a verdict imposing a death sentence. Prospective juror No. 102 said she could not set aside her objections to the death penalty. And prospective juror No. 95 said he was morally opposed to the death penalty due to his convictions as a Seventh-Day Adventist.

**{¶ 227}** Thompson says defense counsel should have either objected to the dismissal of all six of those prospective jurors or attempted to rehabilitate them. But "fail[ing] to rehabilitate jurors does not render trial counsel ineffective." *State v. Lindsey*, 87 Ohio St.3d 479, 489, 721 N.E.2d 995 (2000). Trial "counsel [are] in the best position to determine whether the jurors could be rehabilitated," *Davis*, 116 Ohio St.3d 404, 2008-Ohio-2, 880 N.E.2d 31, at ¶ 58, because they have witnessed each prospective juror's "demeanor and statements," *Lindsey* at 489. We are not in a "position to second-guess counsel on this point." *Hale*, 119 Ohio St.3d 118, 2008-Ohio-3426, 892 N.E.2d 864, at ¶ 213.

**{¶ 228}** In addition, Thompson cannot establish that he was prejudiced by any alleged error. There is no way to "know whether these jurors *could* have been rehabilitated." (Emphasis sic.) *Id.* Nor is there any "evidence in the record that the seated jurors were unable to follow their oaths and to make a recommendation of death only when permitted by law and warranted by the facts." *Lindsey* at 490.

**{¶ 229}** Second, Thompson argues that defense counsel should have asked the trial court to life-qualify the prospective jurors or, at the very least, taken it upon themselves to do so. In *Morgan v. Illinois*, 504 U.S. 719, 729-734, 112

S.Ct. 2222, 119 L.Ed.2d 492 (1992), the United States Supreme Court held that upon a defendant's request, a trial court must life-qualify a jury. But *"Morgan* does not mandate that life-qualifying questions be asked of potential jurors in every case." *Stanford v. Parker*, 266 F.3d 442, 454 (6th Cir.2001). *See also Thomas v. Horn*, 570 F.3d 105, 122 (3d Cir.2009). Instead, it allows for the possibility that in some instances "counsel might choose not to ask life-qualifying questions as a matter of strategy." *Stanford* at 454.

{¶ 230} Here, defense counsel ensured that the prospective jurors would be willing to consider options other than a sentence of a death if Thompson were convicted. Defense counsel (or, in a few instances, the prosecutor) discussed the state's burden of proof at sentencing with every prospective juror who was seated as a juror or alternate and verified that each juror would take mitigating evidence into account. And even if Thompson believes that his counsel should have questioned the prospective jurors further on this point, we must presume that counsel's decision not to inquire further was a matter of trial strategy. *See Strickland*, 466 U.S. at 689, 104 S.Ct. 2052, 80 L.Ed.2d 674.

{¶ 231} Moreover, even if counsel had been deficient in life-qualifying Thompson's jurors, Thompson cannot establish prejudice. None of the seated jurors indicated during voir dire that he or she would automatically impose death if Thompson were convicted. *See State v. Maxwell*, 139 Ohio St.3d 12, 2014-Ohio-1019, 9 N.E.3d 930, ¶ 86; *State v. Myers*, 97 Ohio St.3d 335, 2002-Ohio-6658, 780 N.E.2d 186, ¶ 158.

{¶ 232} Third, Thompson says that trial counsel failed to question prospective jurors adequately about race. Before voir dire began, defense counsel asked the trial court to inquire whether the prospective jurors have had "any problems with a member of the African-American race" that would prevent them from being fair and impartial. During voir dire, the trial court asked this question of every person who was ultimately seated on the jury, and none of their

responses indicated racial bias. Thompson now objects that trial counsel should have conducted *further* inquiry on the matter.

{¶ 233} When a capital defendant is accused of interracial murder, defense counsel are "entitled to engage in racial-bias inquiry," but they are not required to do so. (Emphasis deleted.) *Hale*, 119 Ohio St.3d 118, 2008-Ohio-3426, 892 N.E.2d 864, at ¶ 218. As this court has explained, "the actual decision to question on racial prejudice is a choice best left to a capital defendant's counsel." *State v. Conway*, 108 Ohio St.3d 214, 2006-Ohio-791, 842 N.E.2d 996, ¶ 33. Counsel has to "weigh the risks inherent in interrogating prospective jurors on the sensitive question of racial prejudice." *State v. Perez*, 124 Ohio St.3d 122, 2009-Ohio-6179, 920 N.E.2d 104, ¶ 207. We have rejected claims of deficient performance even when trial counsel asked *no* questions about race in a case in which the defendant was accused of an interracial murder. *See*, *e.g*., *Sanders*, 92 Ohio St.3d at 274, 750 N.E.2d 90; *State v. Smith*, 89 Ohio St.3d 323, 327-328, 731 N.E.2d 645 (2000).

{¶ 234} Here, Thompson's counsel *did* ask the trial court to inquire about racial bias. Counsel heard and saw the prospective jurors' responses to these questions and was in the best position to determine whether additional inquiry was needed. Thompson cannot show that counsel were deficient for not inquiring further on the point. Moreover, he cannot establish prejudice, because there is no evidence that any member of the jury actually harbored racial bias.

{¶ 235} Fourth, Thompson recasts his third proposition of law as an ineffective-assistance claim, arguing that trial counsel should have requested additional voir dire after learning that one prospective juror had overheard other venire members discussing Thompson's withdrawn guilty plea. As explained above, the trial judge's initial inquiries about publicity during individual voir dire, coupled with her questions during group voir dire, were sufficient to " 'reasonabl[y] assur[e] that prejudice would be discovered if present.' " *Chagra*,

669 F.2d at 250, quoting *Hawkins*, 658 F.2d at 283. Accordingly, counsel were not deficient for failing to request additional voir dire on this matter. In addition, Thompson cannot establish prejudice, because no evidence indicates that any seated juror knew about his withdrawn guilty plea.

**{¶ 236}** Finally, Thompson argues that counsel provided ineffective assistance by incorrectly defining the term "mitigating factors" during voir dire. As noted above, during individual voir dire of one prospective juror, trial counsel described mitigating factors as "good things * * * about Mr. Thompson's life" and "any good that the defendant wants you to hear and consider." But that prospective juror was not seated as a juror, and this evidence hardly proves Thompson's sweeping claim that defense counsel "repeatedly described" mitigating factors as "good things." In any event, counsel does not perform deficiently by relying on shorthand references to complex legal concepts during voir dire. *See Lang*, 129 Ohio St.3d 512, 2011-Ohio-4215, 954 N.E.2d 596, at ¶ 246.

**{¶ 237}** In addition, Thompson cannot show prejudice as a result of the alleged error. "[S]horthand references to legal concepts during voir dire cannot be equated to final instructions given shortly before the jury's penalty deliberations." *State v. Stallings*, 89 Ohio St.3d 280, 285, 731 N.E.2d 159 (2000). The trial court correctly instructed the jury about the definition of mitigating factors before the mitigation phase began and again before the jury's sentencing deliberations. These mitigation-phase instructions cured any earlier misstatements on this point during voir dire. *See Lang* at ¶ 246; *State v. Ahmed*, 103 Ohio St.3d 27, 2004-Ohio-4190, 813 N.E.2d 637, ¶ 147. Accordingly, trial counsel did not provide constitutionally ineffective assistance of counsel in this regard.

### b. Failure to Renew Motion for Change of Venue

{¶ 238} Thompson also argues that counsel provided ineffective assistance by failing to renew his venue motion after voir dire. As explained above, the trial court denied the motion after completing individual voir dire on pretrial publicity. Thompson now argues that counsel should have renewed the motion later, at the close of general voir dire.

{¶ 239} Trial counsel's failure to renew the motion was not tantamount to ineffective assistance. This court has rejected ineffective-assistance claims based on venue in cases where "voir dire about pretrial publicity was adequate," as here. *See Davis*, 116 Ohio St.3d 404, 2008-Ohio-2, 880 N.E.2d 31, at ¶ 49; *see also State v. Diar*, 120 Ohio St.3d 460, 2008-Ohio-6266, 900 N.E.2d 565, ¶ 228-229. Under those circumstances, a defendant's counsel may "have reasonably decided not to renew the motion for a change of venue after voir dire was completed." *Diar* at ¶ 229; *see also Davis* at ¶ 49.

{¶ 240} In addition, this failure was not prejudicial. "[A] change of venue is not automatically granted when there is pretrial publicity. Any decision to change venue rests largely within the discretion of the trial judge." *Diar* at ¶ 229. For the reasons explained in the analysis of proposition of law No. VI, the trial court did not err by declining to order a change of venue. As a result, we hold that counsel did not provide ineffective assistance in this regard.

### c. Inadequate Trial Preparations

{¶ 241} Thompson next claims that trial counsel were constitutionally inadequate because they failed to prepare for trial in several key ways.

{¶ 242} First, Thompson objects that counsel should have hired a serologist and a DNA expert to evaluate the state's evidence that Miktarian's DNA was present on Thompson's gun. At trial, the state presented evidence that a mixture of DNA profiles was present on the handle and trigger of the gun. BCI

analyst Stacy Violi testified that the major profile on the swab taken of each belonged to Miktarian, and the minor profile belonged to Thompson.

{¶ 243} On cross-examination, defense counsel asked Violi, "Well, how does [Miktarian's] DNA end up on Mr. Thompson's gun?" Violi responded that she did not know. She conceded that Miktarian's DNA had come from some bodily fluid other than blood and that it was possible that Miktarian had had his hand on Thompson's gun. But Violi was unwilling to say that "the most likely scenario for that DNA transfer" was that Miktarian "had that gun" or "touched that gun" at some point.

{¶ 244} Thompson says defense counsel should have hired an expert to testify that "the presence of the officer's DNA on the gun was indicative of a struggle over the weapon." The decision not to seek expert testimony is often tactical " 'because such an expert might uncover evidence that further inculpates the defendant.' " *State v. Krzywkowski*, 8th Dist. Cuyahoga Nos. 83599, 83842, and 84056, 2004-Ohio-5966, ¶ 22, quoting *State v. Glover*, 12th Dist. Clermont No. CA2001-12-102, 2002-Ohio-6392, ¶ 25. In addition, we have recognized that ineffective assistance does not occur when counsel decides to rely on cross-examination of the state's expert rather than calling a separate defense expert. *State v. Nicholas*, 66 Ohio St.3d 431, 436, 613 N.E.2d 225 (1993). Here, Thompson's counsel did just that, leading Violi to admit that Miktarian's blood was not on Thompson's gun and that Miktarian may have placed his hand on the gun. Accordingly, trial counsel's decision not to hire a defense serologist and DNA expert fell "within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689, 104 S.Ct. 2052, 80 L.Ed.2d 674.

{¶ 245} In addition, Thompson cannot establish prejudice as a result of this alleged deficiency. Violi's testimony did not contradict Thompson's theory that a struggle occurred. And Thompson's claim that another expert would have assisted him is purely speculative. *State v. Madrigal*, 87 Ohio St.3d 378, 390, 721

N.E.2d 52 (2000). It is unclear whether *any* expert would be able to say that Miktarian's bodily fluids were transferred to Thompson's weapon in the process of a struggle. Accordingly, trial counsel's failure to hire a competing expert did not deprive Thompson of a fair trial. *Strickland* at 687.

{¶ 246} Second, Thompson argues that counsel did not conduct an adequate pretrial investigation because they did not hire a private investigator. During a pretrial hearing on February 24, 2010, defense counsel stated, "Mr. Thompson is requesting that we file a motion and have the Court sign an order allowing him to get his own—the Court appoint an investigator for him, and we're suggesting specifically Tom Fields." The court responded, "I need a motion as to why that would be relevant at this point in the proceedings." She explained that although discovery was complete, she would consider it: "[I]f you have something specific you want me to think about, of course, I'll look at that. But it's going to have to be specific. We're not going to just appoint an investigator." The court had already appointed two experts, a psychologist and a mitigation specialist, and the latter "was supposed to be interviewing people and getting information." Thus, the court sought a request for "something specific that would be different from what we've already paid for." The record does not indicate that Thompson's counsel ever filed the motion.

{¶ 247} Trial counsel's pretrial investigation was not deficient because they failed to hire, or seek court appointment of, a private investigator. As Thompson notes, *Strickland* requires defense counsel "to make reasonable investigations" before trial. 466 U.S. at 691, 104 S.Ct. 2052, 80 L.Ed.2d 674. The record here does not indicate the extent of counsel's pretrial investigation, *see State v. Hunter*, 131 Ohio St.3d 67, 2011-Ohio-6524, 960 N.E.2d 955, ¶ 65, and we will not "infer a defense failure to investigate from a silent record," *State v. Were*, 118 Ohio St.3d 448, 2008-Ohio-2762, 890 N.E.2d 263, ¶ 244. Further, "[a]n attorney's decision not to hire an investigator does not equate to a failure to

68

investigate and result in ineffective assistance of counsel." *State v. Hairston,* 9th Dist. Lorain No. 05CA008768, 2006-Ohio-4925, ¶ 36. Here, Thompson's counsel may have determined that it would be inappropriate to file a motion because they could not demonstrate a particularized need for another court appointment. Accordingly, we defer to counsel's conduct as a reasoned strategic decision. *See Strickland* at 689.

**{¶ 248}** Thompson says nothing to persuade us that he did have a particularized need for a private investigator. He offers two examples of work an investigator might have done: reviewed Roberson's prior statement before she testified at trial and reviewed the videotape from the camera in Miktarian's cruiser. But there is no reason an investigator was needed to complete these two tasks. Counsel could have done both themselves and, indeed, Thompson later argues that they were ineffective because they did not. As a result, this argument fails.

**{¶ 249}** Next, Thompson claims that trial counsel provided ineffective assistance by failing to listen to Roberson's prior statement before she testified at trial. Roberson was the only defense witness and the only witness who testified about the confrontation between Miktarian and Thompson on July 13, 2008. On cross-examination, the state questioned Roberson about the differences between her testimony and her statement to police on July 13. While counsel and the trial court were discussing proper impeachment technique, it became clear that defense counsel had not reviewed Roberson's prior statement, even though the state had made it available during discovery. The court took a break during Roberson's testimony to allow both Roberson and Thompson's counsel to hear the interview for the first time.

**{¶ 250}** Counsel should not have allowed a crucial defense witness to testify without first reviewing her prior statement to police, but even so, Thompson cannot demonstrate prejudice as a result of the error. Thompson says

that if his counsel had been familiar with Roberson's prior statement, they could have better prepared Roberson to testify and the state would not have been able to undermine her credibility. But one of Thompson's attorneys commented, after hearing Roberson's statement, that "about 99 percent" of the prior statement accorded with Roberson's in-court testimony on direct examination. And at closing, he argued that Roberson should be trusted precisely *because* her testimony was "about 98 percent the same" as her statement hours after the murder.

{¶ 251} Thompson also claims that but for counsel's error, he would have been "able to convince the court to give a manslaughter instruction." Thompson is wrong. Even if Roberson's direct testimony had gone entirely unchallenged, it did not merit a voluntary-manslaughter instruction for the reasons explained in the analysis of proposition of law No. XII. Thus, Thompson fails the second prong of *Strickland.*

{¶ 252} Thompson also argues that counsel were ineffective because they did not watch the videotape found in Miktarian's cruiser on July 13. He says that this was key evidence and counsel "shirked their duty to investigate" by failing to review it. As an initial matter, it is not clear from the record whether counsel reviewed the tape. But regardless, Thompson cannot demonstrate that he was prejudiced by the alleged omission. Twinsburg Police Chief Christopher Noga testified that to his knowledge, Miktarian's dashboard camera had not been used in some time and the film recovered from the camera on July 13 was "old." A second officer testified that Miktarian's camera "was always breaking down." Given this testimony, even Thompson concedes that "it is probable the tape was completely unrelated to [his] case." Accordingly, it is unclear how counsel's alleged failure to review the tape could have prejudiced Thompson.

{¶ 253} Finally, Thompson recasts part of his argument in proposition of law No. X as an ineffective-assistance claim. According to Thompson, defense

counsel should have ensured his presence during the inspection of Miktarian's personnel records. As we explained above, however, Thompson offers no support for his claim that his presence was required, or even advisable. Further, he cannot establish prejudice based on this alleged error, because counsel had access to Miktarian's entire file and were able to assess the utility of its contents.

### d. Failure to Object

{¶ 254} Next, Thompson argues that counsel provided ineffective assistance by failing to object to alleged prosecutorial misconduct, improper expert testimony, and trial court errors.

{¶ 255} Each of these claims recasts a merits argument as ineffective assistance of counsel: Proposition of law Nos. I (error in R.C. 2929.03(F) sentencing opinion), IX (improper expert testimony), XI (prosecutorial misconduct), XIII (comments about the mitigation phase), and XVI (constitutional narrowing). For the reasons explained in this opinion, we reject the merits of these underlying claims. As a result, we conclude that counsel did not provide ineffective assistance by failing to object to these alleged errors.

### e. Failure to Present a Complete Defense

{¶ 256} Thompson claims that he received ineffective assistance because trial counsel failed to present a complete defense. He says counsel needed to present an affirmative case consisting of more than Roberson's testimony to demonstrate provocation or self-defense. Specifically, he argues that counsel should have (1) had Thompson testify at trial, (2) requested a self-defense instruction, and (3) presented more affirmative evidence.

{¶ 257} First, counsel did not perform deficiently by not having Thompson testify at trial. Defendants have "a fundamental and a personal right" to testify, which is "waivable only by an accused." *State v. Bey*, 85 Ohio St.3d 487, 499, 709 N.E.2d 484 (1999). Thompson says he needed to testify to establish the requisite mental state for his primary defense—that he acted in a fit

of rage or under serious provocation. But the record confirms that *Thompson* waived his right to testify. Before the defense rested, the trial court asked defense counsel, "Are you going to call him?" One of Thompson's lawyers answered, "I just talked to [Thompson], and he said he's not going to testify." Then both defense counsel "conferred with Mr. Thompson" together, and they reported, "It is his opinion that he does not wish to testify." There is no evidence that Thompson did not freely waive his right. *See Bey* at 499 (trial court has no obligation to inquire about a defendant's waiver). Accordingly, Thompson cannot establish deficient performance in this regard.

**{¶ 258}** Second, Thompson argues that counsel should have requested a self-defense instruction. Under Ohio law, "[t]o establish self-defense, a defendant must prove the following elements: (1) that the defendant was not at fault in creating the situation giving rise to the affray; (2) that the defendant had a bona fide belief that he was in imminent danger of death or great bodily harm and that his only means of escape from such danger was the use of such force; and (3) that the defendant did not violate any duty to retreat or avoid the danger." *State v. Barnes*, 94 Ohio St.3d 21, 24, 759 N.E.2d 1240 (2002).

**{¶ 259}** At trial, the defense attempted to portray Miktarian as rude, threatening, and possibly dangerous. Even so, defense counsel may have reasonably decided not to request a self-defense instruction because they did not think the jury would believe that Thompson was not at fault in creating the situation or that he needed to shoot Miktarian *four* times, twice as he lay on the ground, in order to escape whatever danger he supposedly faced. *See State v. Hall*, 10th Dist. Franklin No. 04-AP-17, 2005-Ohio-335, ¶ 40 (firing multiple shots undercuts a claim of self-defense). Absent evidence to the contrary, we must presume that counsel's decision was strategic and reject Thompson's allegation of deficient performance. *See Strickland*, 466 U.S. at 689, 104 S.Ct.

2052, 80 L.Ed.2d 674; *State v. Roberts*, 8th Dist. Cuyahoga No. 69310, 1996 WL 239889, *3 (1996).

{¶ 260} Last, Thompson claims that counsel needed to produce more evidence to prove self-defense or voluntary manslaughter. Here, trial counsel presented Roberson's testimony. It is not clear what other evidence Thompson would have had counsel introduce. Thus, we presume that trial counsel's decision was strategic. *See Wong v. Money*, 142 F.3d 313, 321 (6th Cir.1998) ("under *Strickland*, it is not our province to dictate to defense counsel the appropriate strategy to pursue in a particular case").

{¶ 261} In sum, Thompson cannot establish that he received constitutionally ineffective assistance of counsel during the pretrial or trial phases.

### 2. Mitigation Phase

{¶ 262} In proposition of law No. XIV, Thompson argues that counsel provided ineffective assistance of counsel at the mitigation phase in four respects.

{¶ 263} First, Thompson says counsel lost all credibility with the jury by making inconsistent arguments at the trial and mitigation phases. During closing arguments at the trial phase, defense counsel urged the jury to find that Thompson lacked the requisite intent for aggravated murder—"he didn't have a purpose, to hurt this police officer." But after the jury found that Thompson *had* acted with purpose at the trial phase, counsel told the jurors that they had "nailed" the verdict "100 percent." Thompson says this comment amounted to an admission that defense counsel had tried (unsuccessfully) to mislead the jurors at the trial phase, thus completely undermining counsel's credibility when he urged the jurors to return a life sentence.

{¶ 264} To evaluate Thompson's claim, we must consider the context of defense counsel's mitigation-phase statement. During closing arguments, counsel said:

There is no excuse for [Mr. Thompson's] actions.

You guys found that in your verdict last week, which is a verdict you guys nailed 100 percent.

It's important that you know what happened that morning. Again, we do not give you that to excuse his actions, but we do present that evidence to help explain his actions.

And that is an important thing that you are going to have to consider.

Because if you remember what the Judge told you just five minutes ago, one of the mitigating factors is whether it is unlikely that the offense would have been committed but for the fact that the Defendant was under duress, coercion or strong provocation * * *.

{¶ 265} Although somewhat inartfully expressed, defense counsel's message to the jury was consistent. Counsel never disputed that Thompson had killed Miktarian at either phase of the trial. Instead, his counsel consistently tried to focus the jurors on Thompson's mental state. During the trial phase, counsel argued that the circumstances of the crime indicated Thompson's lack of "purpose." But after the jurors convicted Thompson of aggravated murder, counsel adjusted the same essential argument for a different end. Rather than continuing to argue lack of purpose to jurors who had just found purpose, counsel endorsed the jury's verdict and instead cited the circumstances of the crime and Thompson's mental state as reasons to find a specific mitigating factor: he acted under coercion, duress, or provocation. R.C. 2929.04(B)(2). In short, counsel continued to admit Thompson's fault, but still attempted to explain his conduct.

{¶ 266} Trial counsel's strategic decisions—including decisions about how to present a mitigation case after a defendant is convicted of aggravated

murder—are entitled to great deference. *See State v. Carter*, 72 Ohio St.3d 545, 558, 651 N.E.2d 965 (1995). Here, we give deference to trial counsel's decision and reject Thompson's claim of deficient performance.

{¶ 267} Second, Thompson says counsel should have argued the nature and circumstances of the offense as a mitigating factor. R.C. 2929.04(B). According to Thompson, counsel abandoned any attempt to explain his conduct on July 13, instead urging the jury to focus on the positive aspects of his life.

{¶ 268} Thompson's description of trial counsel's mitigation argument is misleading. During his closing, counsel did urge the jury to consider the good things Thompson had done (and his lack of significant criminal history, R.C. 2929.04(B)(5)), but he *also* pressed the theory that Thompson acted under coercion, duress, or extreme provocation. *See* R.C. 2929.04(B)(2). In fact, counsel argued at length about how Thompson must have felt at various points on July 13. Thus, far from entirely dismissing Thompson's mitigation account and ignoring the nature and circumstances of the crime, counsel actually attempted to portray Thompson's conduct on July 13 as an aberration born of circumstance.

{¶ 269} Further, to the extent that Thompson asserts that counsel should have argued the nature and circumstances of the crime as a separate mitigating factor, we do not find that counsel were deficient in failing to do so. Counsel discussed the circumstances of the crime in the context of articulating a theory of coercion or provocation. If he had specifically argued the nature and circumstances of the crime in mitigation, then the prosecutor would have been able to argue nature and circumstances on rebuttal. *Frazier*, 115 Ohio St.3d 139, 2007-Ohio-5048, 873 N.E.2d 1263, at ¶ 183-184. Counsel may have wished to avoid opening the door to potentially damaging rebuttal evidence. Accordingly, we defer to counsel's decision not to argue that particular mitigating factor as a reasonable strategic judgment.

{¶ 270} Third, Thompson says that counsel should have offered mitigation testimony from psychological and neuropsychological experts. Although the defense had used and consulted with court-appointed psychologist Dr. James Siddall, the defense ultimately decided that Siddall would not testify. Thompson argues that this decision was deficient, given the circumstances of his crime, because it was crucial to have a psychologist testify about his actions. But the record does not indicate what Siddall would have testified to or whether that testimony would have been at all helpful to Thompson.

{¶ 271} Thompson also argues that counsel were deficient for not hiring a separate neuropsychological expert. Thompson does not, however, point to any evidence of a possible organic brain impairment that might have merited separate examination by a neuropsychologist. *See Fautenberry v. Mitchell*, 515 F.3d 614, 625 (6th Cir.2008) (neuropsychological examination is the best way to determine brain impairment).

{¶ 272} Accordingly, on this record, we cannot fault trial counsel for not having Siddall testify or for failing to request court appointment of a neuropsychological expert.

{¶ 273} Last, Thompson faults counsel for failing to object to the state's mitigation closing argument. This claim recasts part of Thompson's prosecutorial-misconduct claim in proposition of law No. XI, which we reject. We likewise conclude that counsel were not deficient for failing to object.

{¶ 274} For all these reasons, Thompson's allegations of deficient performance during the mitigation phase fail. In addition, Thompson has failed to establish prejudice under *Strickland*, 466 U.S. at 694, 104 S.Ct. 2052, 80 L.Ed.2d 674. We therefore reject these claims.

### 3. Cumulative Ineffective Assistance

{¶ 275} Finally, Thompson asserts that counsel's "myriad failures" deprived him of his right to counsel, freedom from cruel and unusual punishment,

a fair trial, and due process. But the above analysis does not indicate myriad failures. And even in cases when multiple errors have occurred, we have explained that errors "cannot become prejudicial by sheer weight of numbers." *State v. Hill*, 75 Ohio St.3d 195, 212, 661 N.E.2d 1068 (1996).

{¶ 276} We therefore reject proposition of law Nos. XIII and XIV.

### K. Cumulative Error

{¶ 277} In proposition of law No. XV, Thompson argues that the cumulative impact of the many errors at his trial rendered it fundamentally unfair. We reject this proposition. As detailed above, Thompson has not established the multiple instances of error necessary to sustain his claim. *See Powell*, 132 Ohio St.3d 233, 2012-Ohio-2577, 971 N.E.2d 865, at ¶ 223; *State v. Garner*, 74 Ohio St.3d 49, 64, 656 N.E.2d 623 (1995).

### L. Challenges to the Death Penalty

#### 1. Constitutional Narrowing Requirement

{¶ 278} In proposition of law No. XVI, Thompson contends that Ohio law unconstitutionally fails to narrow the class of homicides subject to capital punishment because killing a law-enforcement officer constitutes aggravated murder under R.C. 2903.01(E) and is also an aggravating circumstance under R.C. 2929.04(A)(6). We rejected this precise argument in *Bryan*, 101 Ohio St.3d 272, 2004-Ohio-971, 804 N.E.2d 433, at ¶ 55. Therefore, this proposition fails.

#### 2. Constitutional and International-Law Challenges

{¶ 279} Proposition of law No. XVIII presents six oft-raised—and always rejected—constitutional challenges to Ohio's capital-punishment scheme. In addition, Thompson also argues that Ohio's death-penalty statutes violate international law and treaties and therefore offend the Supremacy Clause.

{¶ 280} We have previously considered and rejected each of Thompson's various claims. "Ohio's statutory framework for imposition of capital punishment * * * does not violate the Eighth and Fourteenth Amendments to the United States

Constitution or any provision of the Ohio Constitution." *State v. Jenkins*, 15 Ohio St.3d 164, 473 N.E.2d 264 (1984), paragraph one of the syllabus. Nor does it violate international treaties, thereby offending the Supremacy Clause. *Bey*, 85 Ohio St.3d at 502, 709 N.E.2d 484. Accordingly, we summarily reject proposition of law No. XVIII. *See, e.g., State v. Fry*, 125 Ohio St.3d 163, 2010-Ohio-1017, 926 N.E.2d 1239, ¶ 215-216; *Davis*, 116 Ohio St.3d 404, 2008-Ohio-2, 880 N.E.2d 31, ¶ 381-383; *State v. Carter*, 89 Ohio St.3d 593, 608, 734 N.E.2d 345 (2000).

## M. Independent Sentence Evaluation

{¶ 281} Finally, in proposition of law No. XVII, Thompson argues that his death sentence is inappropriate and not proportionate when compared to sentences imposed for similar offenses. This claim invokes R.C. 2929.05(A), which requires us to independently review Thompson's death sentence for appropriateness and proportionality. In conducting this review, we must determine whether the evidence supports the jury's finding of aggravating circumstances, whether the aggravating circumstances outweigh the mitigating factors, and whether Thompson's death sentence is proportionate to those affirmed in similar cases. R.C. 2929.05(A).

## 1. Aggravating Circumstances

{¶ 282} Two aggravating circumstances were in play at sentencing: (1) Thompson murdered a law-enforcement officer who was engaged in his official duties, R.C. 2929.04(A)(6), and (2) he did so to escape detection for another offense, R.C. 2929.04(A)(3). The evidence supports the jury's finding of both aggravating circumstances beyond a reasonable doubt.

{¶ 283} As to the (A)(6) specification, evidence established that Miktarian was wearing a uniform and driving a police cruiser when he pulled Thompson over on July 13, 2008. Miktarian had reported the stop to dispatch, taken

Thompson's license and insurance card, and placed one handcuff on Thompson before he was murdered.

{¶ 284} Sufficient evidence also supports Thompson's conviction on the (A)(3) specification—he killed Miktarian "for the purpose of escaping detection, apprehension, trial, or punishment for another offense committed by the offender." R.C. 2929.04(A)(3). Here, the trial court correctly instructed the jurors that in order to find Thompson guilty of the (A)(3) specification, they had to find that Thompson had committed one or more of the following offenses before the murder: "[c]arrying a concealed weapon and/or resisting arrest and/or operating a motor vehicle while under the influence and/or the noise ordinance." *See State v. Conway*, 109 Ohio St.3d 412, 2006-Ohio-2815, 848 N.E.2d 810, ¶ 44 ("proof of the defendant's commission of the prior offense" is an essential element of the (A)(3) specification). The jury returned guilty verdicts on separate counts of resisting arrest and carrying a concealed weapon, and Thompson does not challenge those convictions. In addition, defense counsel conceded Thompson's violation of the noise ordinance before the case went to the jury. Accordingly, the evidence supports Thompson's conviction on the (A)(3) specification based on these three offenses.

### 2. Mitigating Factors

{¶ 285} We must weigh the above aggravating circumstances against any mitigating evidence about "the nature and circumstances of the offense" and Thompson's "history, character, and background." R.C. 2929.04(B). In addition, we must consider the statutory mitigating factors under R.C. 2929.04: (B)(1) (victim inducement), (B)(2) (duress, coercion, or strong provocation), (B)(3) (mental disease or defect), (B)(4) (youth), (B)(5) (lack of significant criminal history), (B)(6) (accomplice only), and (B)(7) (any other relevant factors).

### a. Thompson's Mitigation Evidence

**{¶ 286}** At the mitigation hearing, the defense presented 13 witnesses. Thompson also made an unsworn statement to the jury.

**{¶ 287}** Thompson's family and friends testified that he was a considerate and compassionate person. He had had a stable upbringing and had been involved in Cub Scouts and in sports while growing up. He maintained close personal relationships and spent time taking care of others, including his mother, sisters, and niece. Thompson also regularly came to the aid of friends in need.

**{¶ 288}** Thompson attended three colleges and became certified as a licensed practical nurse ("LPN"). He had been practicing as an LPN for three years prior to Miktarian's murder. Witnesses testified that Thompson was passionate about his work as a nurse and about helping others. Thompson himself stated that he loved his profession and that he regularly bonded with patients.

**{¶ 289}** The witnesses also testified to Thompson's religious convictions, describing him as a Christian who regularly sought out spiritual counsel. From a young age, Thompson attended church, was involved in service activities, and led Bible studies.

**{¶ 290}** Finally, Thompson gave an unsworn statement. He first addressed Miktarian's family and said, "I apologize from the bottom of my heart." He said, "I can't apologize enough," and "I didn't want to ever kill anybody * * *." He also explained that he is not unfeeling and only kept a straight face throughout the trial upon the advice of counsel. Thompson noted that he had confessed to killing Miktarian on the day of the incident and that he had promptly "told [police] why."

**{¶ 291}** Thompson explained that as an independent home-health-care provider, he worked in rough neighborhoods. His shifts sometimes required him to arrive early in the morning or late at night, so Thompson decided to purchase a

handgun.  He took a class and obtained a license to carry a concealed handgun.  He kept the gun in his car when traveling to work.

{¶ 292} Thompson then discussed his preference for loud music.  He admitted that he has one or two past misdemeanor violations on his record for playing music too loudly.  He noted that he was driving with his "music up loud" on the night of Miktarian's murder.

{¶ 293} Finally, Thompson began recounting the events of July 13, 2008.  As Thompson tells it, the night played out as follows:

{¶ 294} Thompson had just pulled into his driveway when Miktarian's cruiser pulled in behind him.  Miktarian came up to the vehicle and said, " 'Hey, where are you going,' you know, 'you playing that boom, boom, boom music.' " Miktarian asked for Thompson's license, and Thompson also offered him his insurance card.

{¶ 295} Miktarian went back to his cruiser.  When he returned, Thompson got out of his car and asked, " 'Sir, what is this about?  What's going on?' " Miktarian said again, "[W]ell, you got loud music and, you know, you were playing that boom, boom, boom, you know, S word stuff and I should rip it out and then I followed you for two miles and you pulled in here."  Thompson told Miktarian that Thompson had not realized that Miktarian was following him until he saw the lights pulling up in the driveway.  According to Thompson, this comment angered Miktarian.

{¶ 296} Next, Miktarian grabbed Thompson's arm and "slapped the cuffs" on Thompson's right hand.  Miktarian did not give Thompson any warning or say he was under arrest.  Thompson reflexively jerked away, not understanding why Miktarian was so angry.  Miktarian pulled him toward the police cruiser, but would not respond to his continued inquiries about what was happening.

{¶ 297} At this point, Thompson said, he had heard the officer's dog barking, "maybe because the dog saw us, you know, struggling with each other."

Then Thompson "really got alarmed," fearing that Miktarian would put him in the back of the car with the dog. Thompson dug his "heels into the ground" and continued to ask whether he was under arrest.

{¶ 298} The officer knocked Thompson "to the ground some kind of way, pretty hard" and "knocked [his] wind out" for a few seconds. Thompson got up and heard the officer radio for a unit. Then the officer threatened to release the dog. Thompson continued to ask what was going on. He saw the officer reach to his right side and "could have sworn he was pulling his gun out, you know, to shoot me." Thompson did not actually see the object, but he said "it kind of * * * looked like the gun."

{¶ 299} Thompson shot Miktarian. He told Roberson to get in the car, and they left. He said he was thinking, "[I]f I'm here and the police pull up, they're not going to want to know what happened, they're going to shoot us."

{¶ 300} Thompson admitted that he never told the officer that he had a weapon. He said he was not even thinking about the gun, since he was stopped in his own driveway and it was not a normal traffic stop.

### b. Weight of Mitigating Factors

{¶ 301} Thompson urges us to assign weight to the following mitigating factors: the nature and circumstances of the offense; the presence of duress, coercion, or strong provocation; his history, character, and background; his lack of significant criminal history; his remorse; and his ability to adjust to prison. Thompson does not argue inducement, mental disease or defect, youth, or accomplice status.

{¶ 302} In his briefs and at oral argument, Thompson attributed significant mitigating weight to the nature and circumstances of the offense. *See* R.C. 2929.04(B). Specifically, he claims that he drew his gun and shot Miktarian only because he felt threatened and he panicked. According to Thompson's unsworn statement, the officer slammed him against a patrol car, threatened to release his

dog on him, and reached for his belt. Thompson said he panicked because he believed that Miktarian was reaching for his gun. Thompson's counsel says all of these factors led Thompson to make "a very bad judgment call"—a "bad decision"—when he killed Miktarian. But the words "judgment" and "decision" themselves suggest that Thompson was in control when he shot the officer.

{¶ 303} In addition, Thompson's behavior on the night of the murder undermines his claim that he was cooperative until he became convinced that Miktarian posed a threat to him. Evidence at trial indicated that Thompson was upset hours before he encountered Miktarian. He later told his girlfriend in a call from prison that he had been "pissed" when he picked her up around midnight. And at Rav's Bar, a patron had heard Thompson saying, "There's demons in me," "I will kill any one f* * *er that threatens me," and "Nobody understands the s* * * I've done and am capable of doing. I can't even talk about it." Thompson had also been drinking. This evidence suggests Thompson's state of mind when Miktarian pulled him over.

{¶ 304} More important, the nature and circumstances of the traffic stop itself contradict Thompson's claim of panic. Thompson shot Miktarian *four* times. First, he shot Miktarian twice from close range. After Miktarian fell, Thompson bent down, pressed his gun up against Miktarian's head, and pulled the trigger two more times.

{¶ 305} Thus, the nature and circumstances of the crime do not support Thompson's claims of panic or entitle him to any mitigating weight. Thompson relies on much of the same evidence to argue that "it is unlikely that the offense would have been committed, but for the fact that [he] was under duress, coercion, or strong provocation." R.C. 2929.04(B)(2). As we found above, the facts do not support Thompson's claims that provocation led him to shoot Miktarian four times in the head, at point-blank range. Thus, we do not assign mitigating weight to the (B)(2) factor.

**{¶ 306}** Next, Thompson says his history, character, and background are entitled to mitigating weight under R.C. 2929.04(B). Thompson took pride in his profession and strove to develop meaningful relationships with his nursing patients. Indeed, he purchased a gun only to protect himself in the tough neighborhoods where he worked. Mitigation testimony also indicates that Thompson had a good childhood and has strong relationships with his family and friends. Others regard him as reliable, caring, and dependable. He is well-educated and is an active participant in his church. We give some weight to this evidence.

**{¶ 307}** Thompson does not argue his youth, but we consider it under R.C. 2929.04(B)(4). Thompson was 23 years old when he killed Miktarian. This is entitled to some weight. *See State v. Ballew*, 76 Ohio St.3d 244, 257, 667 N.E.2d 369 (1996) ("find[ing] the mitigating factor in R.C. 2929.04(B)(4) (youth) entitled to little weight, since Ballew was twenty-two at the time of the offense").

**{¶ 308}** We recognize that Thompson does not have a history of significant criminal convictions. *See* R.C. 2929.04(B)(5). He has two prior minor-misdemeanor convictions for violating a noise ordinance, by playing loud music, and one conviction for having physical control of a motor vehicle while intoxicated. We give significant weight to this factor. *See White*, 85 Ohio St.3d at 454, 709 N.E.2d 140.

**{¶ 309}** Under the catchall provision, R.C. 2929.04(B)(7), Thompson urges us to consider his expressions of remorse to Miktarian's family and the likelihood that he can adjust to life in prison. At the outset of his unsworn statement, Thompson offered a genuine expression of remorse to the victim's family. He emphasized that he is not unfeeling and told Miktarian's widow that he could not imagine her pain. In addition, Thompson's character as an educated, nonviolent, caring, and dependable individual makes him well suited to adapt to life in prison. We also give these factors some weight.

{¶ 310} Finally, although Thompson does not argue this point (and his initial statements were not admitted at trial), we note that he apparently admitted responsibility to the police upon his arrest. The significance of this admission is diminished, however, because Thompson initially fled the scene and resisted arrest. Rather than turn himself in, Thompson struggled with officers so violently that he pulled off a refrigerator door in the process of being apprehended. Under these circumstances, we assign only minimal weight to his admissions.

### 3. Weighing

{¶ 311} As detailed above, Thompson has presented some mitigating evidence that holds weight. We are not, however, persuaded that his actions are mitigated either by the nature and circumstances of the offense or because he acted under supposed provocation.

{¶ 312} On balance, the aggravating circumstances here outweigh any mitigating factors. Thompson's murder of a police officer engaged in official duties and his commission of murder to escape detection are both "grave circumstances." *See Bryan*, 101 Ohio St.3d 272, 2004-Ohio-971, 804 N.E.2d 433, ¶ 227. These circumstances clearly outweigh the mitigating factors beyond a reasonable doubt. As a result, we find that a death sentence is appropriate.

### 4. Proportionality

{¶ 313} The death penalty is appropriate and proportionate here when compared to death sentences approved in similar cases. We have previously upheld death sentences for killing a law-enforcement officer who is engaged in official duties. *See, e.g.*, *Bryan* at ¶ 228; *Jones*, 91 Ohio St.3d at 357-358, 744 N.E.2d 1163; *State v. White*, 82 Ohio St.3d 16, 29, 693 N.E.2d 772 (1998); *State v. Mitts*, 81 Ohio St.3d 223, 237, 690 N.E.2d 522 (1998). We have also upheld the death penalty for other murders committed to escape detection under R.C. 2929.04(A)(3). *See, e.g.*, *State v. Lawson*, 64 Ohio St.3d 336, 353, 595 N.E.2d 902 (1992); *State v. Hicks*, 43 Ohio St.3d 72, 81, 538 N.E.2d 1030 (1989).

### III. CONCLUSION

{¶ 314} We affirm the judgments of conviction and sentence of death. We also clarify that Thompson's sentence for Count 4, fifth-degree felony escape, is 12 months, rather than five years.

Judgment affirmed.

O'CONNOR, C.J., and O'DONNELL and KENNEDY, JJ., concur.

PFEIFER and LANZINGER, JJ., concur in part and dissent in part.

O'NEILL, J., concurs in part and dissents in part.

_____

**PFEIFER, J., concurring in part and dissenting in part.**

{¶ 315} I concur in the affirmance of Thompson's convictions. There is ample evidence to conclude beyond a reasonable doubt that Thompson committed the heinous crimes of which he was found guilty. None of Thompson's propositions of law was adopted by the majority, nor should any have been. Nevertheless, I do not agree that a death sentence is warranted. Although it is a close call, upon independent weighing, I conclude that the mitigating circumstances, particularly Thompson's history, character, and background, are sufficient to outweigh the aggravating circumstances. I would sentence Thompson to life without parole.

LANZINGER, J., concurs in the foregoing opinion.

_____

**O'NEILL, J., concurring in part and dissenting in part**.

{¶ 316} A police officer lies dead in the street and a nurse stands accused of his murder. Following a trial, a jury has recommended a sentence of death, and this court is charged with independently deciding whether that is the appropriate result. A more serious matter cannot be imagined.

{¶ 317} Before affirming a sentence of death, this court is required to consider both the offense and the offender and to independently weigh all the

facts and evidence disclosed in the record in the case. R.C. 2929.05(A). In order to affirm a sentence of death, a majority of this court "must be persuaded beyond a reasonable doubt that the aggravating circumstances make the sentence appropriate." *State v. Franklin*, 97 Ohio St.3d 1, 2002-Ohio-5304, 776 N.E.2d 26, ¶ 90. And in determining whether a death sentence is appropriate beyond a reasonable doubt, the court "shall review all of the facts and other evidence to determine if the evidence supports the finding of the aggravating circumstances * * * and shall determine whether the sentencing court properly weighed the aggravating circumstances the offender was found guilty of committing and the mitigating factors." R.C. 2929.05(A). It is then, and only then, that the statute permits the court to determine whether the sentence of death is appropriate.

{¶ 318} This review is critical—it is the process that was designed to protect the defendant's right to due process as well as to ensure that the death penalty is reserved for those offenders for whom the legislature intended to impose the irrevocable sanction. And in my opinion, the majority has badly missed the mark. We must be ever vigilant to ensure that we have not abdicated our role as the "13th juror" in death-penalty review, and here the majority's analysis fails.

{¶ 319} First, the court incorrectly concludes that "[t]he evidence supports Thompson's conviction on the [R.C. 2929.04](A)(3) specification," that is, that Thompson killed Officer Miktarian "for the purpose of escaping detection, apprehension, trial, or punishment for another offense." The evidence unquestionably shows that Thompson committed the offenses of resisting arrest and violation of a noise ordinance. But the record also refutes the conclusion that Thompson killed the officer for the purpose of escaping responsibility for his actions. The majority's judgment totally disregards the only witness testimony to describe the altercation. Danielle Roberson, who was a passenger in the car and witnessed the entire deadly encounter, testified that Officer Miktarian was

aggressive towards Thompson from the beginning. She testified under oath that the police officer yelled at Thompson immediately upon encountering him, and that when Thompson got out of his car, the officer, without any explanation of what charge was being anticipated, slapped a handcuff on him and threatened to "let [his] dog out on [Thompson's] ass." It is clear that the arrest process was in progress when the altercation between the officer and the nurse turned deadly; when he shot Officer Miktarian and even when he was subsequently arrested, Thompson was already wearing a handcuff on one hand. Thompson explained all of this in his mitigation statement:

> And at this point, after I been cuffed and the only thing he told me was music, and then after that, you know, I see and hear this dog barking, okay, and you're trying to put me in the car with that; and, by the way, when I'm getting off the ground he threatened to release the dog on me and he said something like "Don't do anything stupid, I will let him out"; so, now I'm thinking where is this getting ready to go, all of this behind loud music and, you know, why not a ticket or even if I was under arrest just say something, why are you throwing me around like this and slamming me around?
>
> * * *
>
> When he reached down to his right side I just—I could have sworn he was pulling his gun out, you know, to shoot me.

{¶ 320} Accordingly, the only evidence presented on the issue directly contradicts the theory that Thompson was trying to avoid responsibility, and the majority makes no serious attempt to show otherwise. The only reasonable explanation for this tragic event is that Thompson was confused and frightened

and mistakenly concluded that Officer Miktarian planned to attack him—either by releasing the police dog or by shooting him. The court's conclusion that Thompson shot Miktarian to avoid being detected, apprehended, or punished is pure fiction. The necessary proof of that aggravating factor ("the purpose of escaping detection, apprehension, trial, or punishment for another offense committed by the offender") can only be inferred from the fact of the crimes. Such an inference is far short of proof beyond a reasonable doubt.

{¶ 321} As a result, there are really not two aggravating factors present in this case, but instead only one: the victim's status as a law-enforcement officer. Clearly, that aggravating factor is entitled to significant weight—an officer has died in the line of duty, and I have nothing but gratitude and sympathy for the family of Officer Miktarian. But Ashford Thompson's mitigating factors are entitled to significant weight as well. He went to college, was a licensed practical nurse and held a steady job as a home-health-care nurse, was a runner, wrestler, and band member in high school, was involved in his community and his church, and was a law-abiding citizen. He admitted that he took the life of a police officer in this tragic encounter, and he expressed significant regret and remorse without trying to minimize his own responsibility. The evidence is uncontroverted that Thompson held a license to carry a concealed weapon, which he obtained for his own protection as he practiced his profession of treating sick people in their homes in dangerous neighborhoods. The sole aggravating factor, while significant and compelling, does not outweigh Thompson's mitigation beyond a reasonable doubt. The majority's conclusion to the contrary rests upon cases that present more heinous crimes and less significant mitigation than that presented here.[1] By contrast, the evidence in this record establishes that this was a routine

---

[1] In *State v. Bryan*, 101 Ohio St.3d 272, 2004-Ohio-971, 804 N.E.2d 433, the defendant was a wanted career criminal who shot a police officer in cold blood and attempted to kill a security officer who witnessed the murder, and whose only mitigating evidence was slight remorse and that he was taught positive values as a child. *Id.* at ¶ 2-3. In *State v. Jones*, 91 Ohio St.3d 335, 345,

traffic stop gone tragically wrong. This case is not in the same category as the premeditated intentional taking of the life of another.

{¶ 322} Reaching the conclusion that the aggravating factors do not outweigh the mitigating factors in no way minimizes Officer Miktarian's sacrifice, his family's loss, or the result of Thompson's horrible crime. This officer gave his life in defense of us all. But the mere fact that Miktarian was a police officer acting in the line of duty cannot provide a justification for imposing the death sentence. The weighing of aggravating factors against mitigating factors is what R.C. 2929.05 requires, and absent a real independent weighing of a death sentence, there is no way to reasonably argue that the process that resulted in that sentence comports with due process. The majority's failure to seriously engage in the weighing process provides yet another reason why, in my opinion, Ohio's system of imposing and reviewing death sentences is unconstitutional. I concur in the majority's affirmance of Thompson's conviction, but dissent from its decision to affirm his death sentence.

————————————

Sherri Bevan Walsh, Summit County Prosecuting Attorney, and Richard S. Kasay, Assistant Prosecuting Attorney, for appellee.

Timothy Young, State Public Defender, and Rachel Troutman and Kimberly S. Rigby, Assistant Public Defenders, for appellant.

————————————

357, 744 N.E.2d 1163 (2001), the defendant shot a police officer in order to escape apprehension for an aggravated robbery, after having told his cousin that he would kill any officer who attempted to arrest him and arming himself with a .38-caliber revolver loaded with hollow-point bullets. In *State v. White*, 82 Ohio St.3d 16, 27-28, 693 N.E.2d 772 (1998), the drunken defendant killed a state trooper by shooting him in the back, having previously fled his home after tying up his mother and sister and shooting his mother in the foot and after having announced to others that "something would happen" to the next officer who pulled him over. And in *State v. Mitts*, 81 Ohio St.3d 223, 690 N.E.2d 522 (1998), the defendant fatally shot a police officer and an innocent bystander because of his race and then attempted to kill two other police officers, seriously wounding one of them.